AWILDA RIVERA JIMÉNEZ y OTROS, demandantes, *v.* GARRIDO & COMPANY, INC., ETC., demandados; ENNIA GENERAL INSURANCE COMPANY, LTD, demandante y tercera demandante y recurrida; AUTORIDAD DE CARRETERAS, tercera demandada y recurrente.

*Números:* CE-90-866     *Resueltos:* 13 de diciembre de 1993
CE-90-876

*Luis A. Rivera Cabrera* y *Melvin E. Maldonado*, abogados de la recurrente Autoridad de Carreteras; *Jorge E. Pérez Díaz, Procurador General, Anabelle Rodríguez, Subprocuradora General*, y *Juan R. Deliz Román, Procurador General Auxiliar*, abogados del Estado Libre Asociado de Puerto Rico, recurrente; *Luis M. Angelet Frau*, de *Vázquez Vizcarrondo & Angelet*, abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

## I

La Carr. PR–30 es una vía de importancia y mucho tránsito. Excepto el tramo del puente sobre el Río Humacao, construido entre marzo de 1984 y febrero de 1985, sus tramos principales estaban terminados para marzo de 1972. El kilómetro 23.9 fue obra realizada por Venancio Morales Const. Corp. para el antiguo Departamento de Obras Públicas entre 1963 y 1964; se conoce como Las Piedras a Humacao. Se construyó cumpliendo cabalmente las normas de diseño y de seguridad existentes y recomendadas para esa época. Tiene dos (2) carriles en cada dirección, divididos por una mediana (isleta) de grama de veinte pies (20′) de ancho. Está bien rotulado, es recto, ancho y con

buena visibilidad.(¹) No se erigieron barreras de seguridad pues el número de pies de su isleta divisoria excedía el recomendado de 16′ de la reglamentación entonces vigente. T.E. de 23 de enero de 1990, págs. 108–109.

Ralph W., natural de República Dominicana, sufrió cuando niño un derrame cerebral que le ocasionó una hemiplejía espástica e incapacidad parcial permanente en todo su lado derecho, más marcada en el brazo y mano. Obtuvo por primera vez licencia de conducir el 15 de junio de 1984, con *restricciones* tales como que el vehículo que condujera tenía que tener transmisión automática, luces direccionales, emergencia de pedal y *no* podía conducir a una velocidad mayor de cuarenta (40) millas por hora en la zona rural, independientemente de que el límite fuera mayor.

El 18 de abril de 1985, aproximadamente a las 11:55 a.m., Ralph W. conducía el vehículo Plymouth, modelo Champ, año 1981, tablilla 97A547, propiedad de sus padres Rafael Hughes Gatón y Anadina Ramón Alvarado. Excepto la transmisión automática, ese vehículo *carecía* de los aditamentos necesarios debido a sus restricciones físicas. Transitaba por el carril de la extrema derecha de la Carr. PR–30, en dirección de Caguas a Humacao. Paralelamente, en la misma dirección, por el carril izquierdo, discurría José L. Acosta Merced en la guagua "Van", marca Ford, tablilla 55V534, con la autorización y para el beneficio de su patrono, Garrido & Compañía, Inc. (en adelante Garrido). En dirección *contraria* —Humacao a Caguas— también por el carril de la derecha, Héctor D. Cuevas Román conducía su vehículo Mitsubishi, modelo Tredia, año 1983, tablilla 30B278.

A la altura del kilómetro 23.9 ocurrió una colisión entre la "Van" y el "Champ", cuando Acosta Merced, *sin observar*

---

(¹) Con motivo de la crisis energética, efectivo el 21 de enero de 1974, el límite de velocidad se redujo a cincuenta y cinco (55) millas por hora.

*ni tomar las debidas precauciones, súbitamente cambió de su carril y penetró directamente al derecho en momentos en que el "Champ" intentaba rebasarlo.* Debido a la velocidad([2]) de los vehículos —de cuarenta y cinco (45) a cincuenta millas por hora (50 mph)— a otros factores y a este choque, Ralph W. perdió el control del "Champ", cruzó frente a la "Van", entró y pasó la isleta divisoria (mediana) que separa los carriles que discurren en dirección contraria e impactó violentamente el "Tredia" provocando que Héctor D. perdiera la vida instantáneamente. Desde el impacto inicial, el "Champ" recorrió errante, sin poderlo controlar Ralph W., un estimado de cien (100) pies hasta chocar el "Tredia".([3])

Este accidente originó dos (2) pleitos separados en el Tribunal Superior, Sala de Humacao, que oportunamente fueron consolidados. El primero (Caso Núm. CS-85-651), instado por Ralph W., sus padres y hermanos, contra Acosta Merced, Garrido, Café Crema y su aseguradora Ennia General Insurance Company, Ltd. (en adelante Ennia). Garrido trajo como terceros demandados a la Autoridad de Carreteras (en adelante Autoridad) y al Departamento de Transportación y Obras Públicas (DTOP). Alegó que la PR–30 estaba bajo la jurisdicción, control y custodia de ambas entidades gubernamentales; eran responsables de su diseño y construcción, y que el accidente se debió a la

---

([2]) "Sustancial" la describió el perito de Ennia General Insurance Company, Ltd. (en adelante Ennia), Ing. David E. Cintrón. T.E. de 25 de enero de 1990, pág. 78.

([3]) T.E. de 25 de enero de 1990, pág. 73. En su alegato Ennia, al discutir las posibles inferencias lógicas de los hechos estipulados —claro está, bajo la presunción errónea de que no hubo prueba de qué causó el accidente— señala "que luego de perder el control inicialmente, Hughes no pudo recobrar el control del vehículo que conducía pues si lo hubiese recobrado, éste probablemente no hubiese impactado el vehículo conducido por Cuevas Román, Q.E.P.D. De la prueba estipulada por las partes y admitida por el Tribunal de Instancia, la inferencia más razonable que puede derivarse respecto a qué Hughes perdió el control de su vehículo, y luego no pudo recuperarlo, es que éste no pudo controlar el vehículo dado a la incapacidad parcial-permanente de la que sufre, más marcada en su brazo y mano derecha, y a que el vehículo que conducía, contrario a lo requerido por las restricciones de su licencia, no estaba dotado de [freno de] emergencia de pedal". (Escolio omitido.) Caso Núm. CE-90-866, Alegato de réplica, pág. 29.

ausencia de una barrera de seguridad en la mediana que divide los carriles que corren en direcciones opuestas. Luego de varios incidentes, mediante demanda de coparte, Ennia reprodujo estas mismas alegaciones contra la Autoridad y el DTOP.

En su contestación a la demanda de tercero y de coparte, el Estado negó responsabilidad por razón del diseño y construcción. Adujo que el accidente se debió a la negligencia de los reclamantes o terceras personas.

El segundo pleito (Caso Núm. CS-86-518) fue presentado por Awilda Rivera Jiménez, por sí y *ex rel.*, sus hijos menores de edad y otros, por la muerte de Héctor D. Fueron demandados Garrido, Ennia, Acosta Merced, Ralph, sus padres y el E.L.A. Nuevamente los codemandados Garrido, Ennia y Acosta Merced formularon demanda de tercero y las mismas alegaciones contra la Autoridad. Igual hicieron los demandados Hughes.

Luego de otros incidentes procesales, la Autoridad contestó esas demandas de terceros. Entre otras defensas, argumentó que no era responsable por el mantenimiento y conservación de la PR–30 y, además, que el accidente se debió a la negligencia de terceros. Subsiguientemente, los demandantes en el Caso Núm. CS-86-518, *Rivera Jiménez et al.*, transigieron su reclamación con Ennia por la suma de trescientos veinticinco mil dólares ($325,000), razón por la cual el 13 de febrero de 1989 se emitió sentencia parcial.

El 23 de agosto de 1989 el tribunal dictó sentencia parcial dando por desistidos a los Hughes de su demanda en el primer pleito y su demanda contra coparte en el segundo. A su vez, Garrido, Acosta Merced y Ennia desistieron de su demanda contra coparte contra los Hughes.

Como resultado, quedaron pendientes la demanda de coparte contra el E.L.A. y la demanda de terceros contra la Autoridad, ambas formuladas por Garrido, Acosta Merced y Ennia, bajo la alegación central de no haberse eregido una barrera de seguridad.

La encuesta judicial sobre responsabilidad quedó señalada en su fondo para los días 23, 24 y 25 de enero de 1990. El primer día las partes sometieron unas estipulaciones de hecho previamente acordadas. Luego, Garrido y Acosta Merced solicitaron permiso para desistir de sus reclamaciones, alegando que Ennia era la parte realmente interesada en resarcirse del E.L.A. y la Autoridad, por haber satisfecho la suma transaccional antes aludida. Sobre la objeción de estos últimos, el tribunal accedió.(⁴)

Previa vista evidenciaria,(⁵) el tribunal (Hon. Carlos De Jesús Rivera Marrero, Juez) dictó sentencia parcial y condenó al Estado y a la Autoridad a reembolsar solidariamente a Ennia la cantidad que posteriormente determinara era la justa compensación que merecían los demandantes originales, *Rivera Jiménez et al.*, más las costas e intereses. Se abstuvo de imponer honorarios de abogado al Estado por estimarlos improcedentes en derecho y la Autoridad no haber incurrido en temeridad.

Durante el proceso la ilustrada sala sentenciadora acogió los planteamientos de Ennia y se negó a admitir cierta prueba sobre la colisión entre la "Van" y el "Champ", y unas admisiones.(⁶) Concluyó que la muerte de Cuevas Ro-

---

(⁴) T.E. de 23 de enero de 1990, págs. 5–7.

(⁵) Se celebró los días 23 y 25 de enero. Por Ennia declararon como testigos hostiles, los ingenieros Máximo Grano de Oro Smith, Director de la Sección de Proyectos Federales del Departamento de Transportación y Obras Públicas (en adelante DTOP), Luis M. Castro, Director retirado del Área de Planificación de la Autoridad de Carreteras (en adelante Autoridad) y Joseph D. Morales Rivera, Director de la División de Planificación y Evaluación de la Comisión para la Seguridad en el Tránsito. Además, Ennia usó como perito al ingeniero Cintrón; por la Autoridad testificó el Ing. Audeliz Jiménez Vera y por el Estado el Sr. Juan M. Aguayo Navarro. Ennia y el Estado también presentaron prueba documental.

(⁶) Como demostraremos, el tribunal *incidió* al negarse a admitir cierta prueba. De ese modo, para todos los efectos, separó los accidentes. Aunque concluyó que hubo un primer impacto entre la "Van" y el "Champ", que éste pasó frente a la "Van" y cruzó la isleta divisoria e impactó el "Tredia" provocando la muerte de Héctor D., concentró su análisis adjudicativo en el segundo impacto.

A tal efecto concluyó que la instalación de barreras de seguridad era *obligatoria*.

En cuanto a las funciones del DTOP y la Autoridad determinó que el primero se encarga de proyectos de conservación de carreteras y mejoras de menor cuantía, y la Autoridad, de construir nuevas carreteras y de la reconstrucción o mejoras "grandes"

mán se debió exclusivamente a la negligencia del Estado y la Autoridad debido a la "[in]existencia de la barrera de seguridad en la mediana de la PR–30 [y ello] fue la causa adecuada, directa, próxima, legal y eficiente ...". Caso Núm. CE-90-876, Alegato de réplica, *Exhibit* I, pág. 28. Además, afirmó: "Este Tribunal *intuye* que en adición a la negligencia del DTOP y/o la Autoridad de Carreteras probablemente la *negligencia de alguien más contribuyó a la ocurrencia del deceso de Cuevas Román.* Ello porque *aún sin la barrera, dicho deceso no hubiese ocurrido si el Champ conducido por Hughes no se hubiese aprestado a cruzar la isleta.* El problema con que se confronta este Tribunal *es que ni el ELA ni Autoridad de Carreteras aportaron prueba alguna, aún habiendo estado en condiciones de así hacerlo, indicativa de que Hughes y / o Acosta Merced, el asegurado de Ennia, contribuyeron de forma o manera alguna a la ocurrencia del mismo".* (Énfasis suplido.) Íd. Se basó en que de las estipulaciones acordadas no podía determinar responsabilidad contra Acosta Merced ni Hughes; que aquél no era parte, y que no podía tomar en consideración el testimonio del ingeniero Cintrón referente al cho-

---

a las existentes. Ambos instalan barreras divisorias dependiendo del costo del proyecto y número de barreras. La Autoridad nunca hizo una recomendación de reparaciones para el tramo de la Carr. PR–30 donde ocurrió el accidente.

Como cuestión de derecho, reconoció que el *Manual de Diseño de Carreteras del Departamento de Transportación y Obras Públicas y la Autoridad de Carreteras de 1979* no tiene fuerza de ley. Sin embargo, configuró sus resguardos y guías como "la forma en que un hombre prudente y razonable debe actuar en relación al diseño de carreteras ... para mejoras y reparaciones a carreteras existentes". Caso Núm. CE-90-876, Alegato de réplica, *Exhibit* I, pág. 23. Concluyó que el Estado y la Autoridad incumplieron con el deber de mantenimiento para hacerla razonablemente segura a sus usuarios al no instalar las barreras de seguridad.

Sentenció que dicha omisión fue la causa adecuada y directa de la muerte de Héctor D., ya que el "Champ" pesaba aproximadamente dos mil (2,000) libras, iba a cincuenta (50) millas por hora, entró en la mediana a un ángulo de veintiocho (28) grados y "[d]adas las características físicas de las barreras medianeras usualmente instaladas en Puerto Rico, en términos de su capacidad de absorber la energía producida por un vehículo que la impacta, de haber estado una barrera instalada en el lugar del accidente, ésta hubiese sido suficiente para detener el Champ y redirigirlo hacia los carriles de Caguas a Humacao, impidiendo que éste cruzara los carriles de Humacao a Caguas y evitando la muerte ...". Caso Núm. CE-90-876, Alegato de réplica, *Exhibit* I, pág. 20.

que entre la "Van" y el "Champ". A solicitud del Estado y la Autoridad, revisamos.[7]

## II

La conclusión previamente expuesta de que el accidente fue causado por la negligencia del chofer Acosta Merced la fundamos primero en su admisión y, además, en un *análisis integral* y cuidadoso de las declaraciones de los testigos y la prueba documental; sobre todo la forma en que quedaron afectados la "Van" y el "Champ" según las numerosas fotografías.

El tribunal de instancia no admitió en evidencia las declaraciones del conductor codemandado Acosta Merced al policía Miguel De León Olmeda, bajo el fundamento de ser prueba de referencia. Éstas se encuentran contenidas en las páginas 20, 22 y 29 de una deposición tomada por Garrido a dicho policía, resultado de su investigación a raíz del accidente, a los efectos de que Acosta Merced en la entrevista le informó al policía De León Olmeda, que al cambiar de carril al derecho no se percató de que por allí transitaba el vehículo de Ralph W. y, como consecuencia, lo impactó con la goma y el bumper del lado derecho, originando el accidente.

Dicho foro basó su dictamen en que Acosta Merced no era "parte" por razón del desistimiento. *Erró.* La representación legal de Acosta Merced reconoce que nuestros pronunciamientos en *Cárdenas Maxán v. Rodríguez,* 119

---

[7] En el Caso Núm. *CE-90-866* el Estado señala como errores no admitir en evidencia las declaraciones del demandado Acosta Merced contenidas en una deposición tomada a Miguel De León Olmeda, agente de la Policía, quien preparó el informe del accidente; concluir que fue negligente; no determinar negligencia concurrente de Garrido, Acosta Merced ni Ralph, e imponerle responsabilidad solidaria sin aplicar la doctrina de negligencia comparada.

Por su parte, la Autoridad (Caso Núm. CE-90-876), impugna la determinación de que "es responsable del mantenimiento y mejoras a una carretera estatal que no diseñó ni construyó ni opera y si en tales circunstancias responde por daños sufridos a consecuencia de un accidente en dicha vía pública que se imputa a la ausencia de mejoras en la misma". Caso Núm. CE-90-876, Petición de *certiorari,* pág. 7.

D.P.R. 642 (1987),[8] cualificaron ese tipo de desistimiento y derrotan esa contención. Para efectos procesales y evidenciarios, Acosta Merced y Garrido continuaron y siguen siendo partes.

■ En cuanto a la admisión, estamos ante una situación cubierta por la Regla 66 de Evidencia, 32 L.P.R.A. Ap. IV, denominada *prueba de referencia múltiple* admisible, ya que la principal y subordinada caen en algunas de las excepciones de la regla de prueba de referencia. Veamos.

■ Acosta Merced era *parte y chofer* de Garrido, asegurado de Ennia. Las Reglas 62(A) y (D) de Evidencia, 32 L.P.R.A. Ap. IV, visualizan como excepciones las declaraciones ofrecidas contra una *parte,* bien en su capacidad individual o representativa, *o* por el agente o empleado de dicha parte con relación a una materia dentro del ámbito de la agencia o empleo, vigente esa relación. Contrario al argumento de Ennia, bajo el inciso D no era necesario autorización alguna del patrono Garrido para hacer las manifestaciones. E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia,* San Juan, Pubs. J.T.S., 1983, pág. 300. En este sentido, los pronunciamientos en *Castro v. Hettinger & Co.,* 79 D.P.R. 884 (1957), deben estimarse modifica-

---

[8] Allí dijimos:

"El efecto neto o consecuencia de todo lo anteriormente expuesto es que el codemandado Rodríguez Rodríguez —no obstante la orden verbal que emitiera en corte abierta el juez de instancia el 9 de junio de 1986— continuó siendo parte en el pleito por cuanto no se dictó, conforme lo resuelto en el caso de *Asociación de Propietarios v. Santa Bárbara, Co.,* ante, sentencia parcial que pusiera fin a la reclamación que contra el codemandado Rodríguez Rodríguez había instado la parte demandante.

"Rechazamos el argumento del Procurador General a los efectos de que una parte en un pleito 'cesa' como tal y 'sale' del mismo meramente porque se le informa al tribunal que ha habido un acuerdo de transacción en cuanto a la reclamación que concierne a dicha parte. Si es que se interesa que un dictamen de esta naturaleza pueda advenir final y firme, se requiere que haya no sólo una acción afirmativa del tribunal concediendo o aprobando la transacción, sino que ésta se plasme por escrito mediante la utilización del mecanismo de la sentencia parcial, que dicha sentencia cumpla con los requisitos exigidos en *Asociación de Propietarios v. Santa Bárbara Co.,* ante, y que, naturalmente, copia de la misma sea archivada en autos y notificada a todas las partes." (Énfasis en el original suprimido.) *Cárdenas Maxán v. Rodríguez,* 119 D.P.R. 642, 653 (1987).

dos a la luz del ordenamiento vigente en las Reglas de Evidencia de 1979.

Por otro lado, la deposición del policía De León Olmeda quedó enmarcada en la excepción de la Regla 64(A)(5) de Evidencia, 32 L.P.R.A. Ap. IV, en conjunción con la Regla 64(B)(1) de Evidencia, 32 L.P.R.A. Ap. IV, testigo no disponible, según quedó demostrado por las gestiones infructuosas del Estado en localizarlo para traerlo como testigo.[9] No se cuestiona que esa deposición fue tomada a solicitud de Ennia, la cual tuvo amplia oportunidad de contrainterrogar, y que su uso por el Estado le fue notificado con anterioridad.

Respecto a la ocurrencia del accidente, es curioso que Ennia objetara las preguntas a su perito ingeniero Cintrón en torno al choque inicial entre la "Van" y el "Champ" por el fundamento de ser "altamente especulativ[o]. El [perito] no estuvo allí, él lo que ha hecho es leer unas deposiciones ...". T.E. de 25 de enero de 1990, págs. 48, 51–52. La objeción no procedía en Derecho. Es obvio, como afirmó el propio ingeniero Cintrón, que sus conclusiones en cuanto a todo el accidente fueron producto de una evaluación integral de la evidencia, a saber, inspecciones del lugar, preparación de diagramas, lectura de deposiciones, fotografías, *exhibit*, etc. Íd., pág. 34. Se trata del mismo método que él denominó *reconstrucción del accidente* y le sirvió para testificar antes a favor de Ennia. Íd., págs. 96–99. *No* se justificaba un tratamiento evidenciario distinto.

## III

Tiene razón la Autoridad. Según indicamos, no existe duda de que la carretera PR–30, incluso el kilómetro 23.9, fue diseñada y construida por el Departamento de Trans-

---

[9] La declaración jurada prestada por Nicolás Mora Vázquez reveló que ni siquiera la hermana de De León Olmeda sabía de su paradero en Estados Unidos.

portación y Obras Públicas. Se trata, pues, de una carretera propiedad del Estado.

■ Según el Art. 397 del Código Político, 3 L.P.R.A. sec. 419, son estaduales las vías públicas construidas con fondos estaduales aprobados por la Asamblea Legislativa.

■ Por su parte, el Art. 403 del Código Político, 3 L.P.R.A. sec. 421, le impone al Secretario de Transportación y Obras Públicas el deber de que las carreteras a su cargo se mantengan en buen estado de conservación. De este modo, el Estado reconoció su obligación y consintió en responder de los daños que la falta de tal mantenimiento o conservación pudieran causar. El Art. 404 del Código Político, 3 L.P.R.A. sec. 422, autorizó acciones por daños causados a personas o propiedades "por desperfectos, falta de reparación o de protección suficientes para el viajero en cualquier vía de comunicación ... excepto donde se pruebe que los desperfectos de referencia fueron causados por la violencia de los elementos y que no hubo tiempo suficiente para remediarlos".

Este precepto es especial y es el que ha de ser utilizado para evaluar acciones por daños ocurridos en esas circunstancias. *Resto v. P.R. Telephone Co.*, 97 D.P.R. 313 (1969). Sin embargo, no convierte al Estado en un garantizador absoluto de la seguridad de las personas que utilizan las carreteras públicas. *Rivera v. Pueblo*, 76 D.P.R. 404, 407 (1954). Se nutre de los elementos preceptuados en el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. *Publio Díaz v. E.L.A.*, 106 D.P.R. 854, 867 (1978); *Morales Muñoz v. Castro*, 85 D.P.R. 288 (1962).

■ Bajo ambos —Art. 404 del Código Político, *supra*, y 1802 del Código Civil, *supra*— es menester probar el nexo de causalidad entre los daños sufridos y las condiciones de la carretera. Sólo hay obligación de indemnizar si los daños constituyen una consecuencia del hecho. *Estremera v. Inmobiliaria Rac., Inc.*, 109 D.P.R. 852, 856 (1980);

*López v. Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197 (1978); J. Castán Tobeñas, *Derecho Civil español, común y foral*, 10ma ed., Madrid, Ed. Reus, 1967, T. 3, pág. 193. En nuestra jurisdicción rige la doctrina de causalidad adecuada. *Jiménez v. Pelegrina Espinet*, 112 D.P.R. 700 (1982); *Soc. de Gananciales v. Jerónimo Corp.*, 103 D.P.R. 127 (1974). De conformidad con esta teoría no es causa toda condición sin la cual no se hubiese producido el resultado, sino aquella que ordinariamente lo produce según la experiencia general. *Arroyo López v. E.L.A.*, 126 D.P.R. 682 (1990); *Cárdenas Maxán v. Rodríguez Rodríguez*, 125 D.P.R. 702 (1990); H. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. I, pág. 696 *et seq*. Al amparo de esta doctrina la cuestión se reduce a determinar si la ocurrencia del daño era de esperarse en el curso normal de los acontecimientos o si, por el contrario, queda fuera de ese posible cálculo. J. Santos Briz, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1984, T. XXIV, pág. 267. Según explicáramos en *Arroyo López v. E.L.A.*, supra, pág. 690:

> ... para que exista relación causal la acción u omisión tiene que ser idónea para producir el efecto operado; tiene que determinarlo normalmente. A fin de establecer esa vinculación de causa y efecto entre esos dos (2) sucesos, tenemos que realizar un análisis retrospectivo de posibilidad. En vista de ello, no es suficiente que un hecho aparezca como condición de un evento si regularmente no trae aparejado ese resultado. La causalidad está necesariamente limitada por el ámbito de la obligación, pues es infinita la serie de daños que, en interminable encadenamiento, pueden derivarse del incumplimiento de una obligación. *Estremera v. Inmobiliaria Rac., Inc.*, 109 D.P.R. 852, 857 (1980).

El propósito de utilizar criterios como el de *causa adecuada* o *causa próxima* es limitar la cadena de responsabilidad y evitar que se extienda a límites absurdos. Brau del Toro, *op. cit.*, págs. 709–710. Si se ha incurrido o no en responsabilidad civil resultante de una omisión hay que

considerar dos (2) factores: la existencia o inexistencia de un deber jurídico de actuar por el alegado causante del daño cuyo incumplimiento constituye un acto antijurídico, y si de haberse realizado el acto omitido se hubiera evitado el daño. *Soc. Gananciales v. G. Padín Co., Inc.*, 117 D.P.R. 94 (1986).

En este caso el tribunal de instancia impuso a la Autoridad un deber, en palabras suyas, que "fluye, en nuestra opinión de la lectura conjunta de las variadas disposiciones legales que imponen responsabilidad bien al DTOP o a la Autoridad de Carreteras". A renglón seguido, decretó que la Autoridad respondía en virtud de los Arts. 3(c), 4(d), (e) y (s) de su ley orgánica, Ley Núm. 74 de 23 de junio de 1965 (9 L.P.R.A. secs. 2003(c), 2004(d), (e) y (s)). Esta determinación es insostenible.

■ Incuestionablemente, bajo el Art. 404 del Código Político, *supra*, la responsabilidad es del Estado, como ente soberano. Sin embargo, ello no significa que todo ente gubernamental ligado a la función de proveer y operar carreteras responda, indistintamente, como si se tratara de una carretera estadual. El pronunciamiento de instancia, refiriéndose a un deber "que se impone al gobierno, ahora en *términos genéricos*, en términos de desperfectos, conservación, o de protección a las personas que utilizan las carreteras estatales" —(énfasis suplido) Alegato de réplica, *Exhibit* I, pág. 22— tiene que configurarse y demostrarse contra la entidad verdaderamente responsable, sea el Estado como tal, la Autoridad, un municipio o una combinación de éstos. Conceptualizar al Gobierno en términos genéricos como responsable bajo el Art. 404 del Código Político, *supra*, despojando a la Autoridad de su personalidad jurídica propia y separada del Estado es un peligroso precedente; la Autoridad no es el Estado. Jurídicamente hablando es una entidad gubernamental que opera como empresa privada, con distinta personalidad. *Unión Em-*

*pleados Carreteras v. J.R.T.*, 119 D.P.R. 116 (1987).([10]) Como tal, diseña, construye, opera y posee sus propias carreteras y sobre éstas se extiende su control y, claro está, su responsabilidad. *Dones Jiménez v. Aut. de Carreteras*, 130 D.P.R. 116 (1992).

La teoría del tribunal sentenciador convierte a la Autoridad y al E.L.A. en una misma cosa. Que la Asamblea Legislativa haya autorizado a la Autoridad a poseer sus propias carreteras, Art. 4(d) (9 L.P.R.A. sec.2004(d)), corrobora que su jurisdicción no se extiende a todas, sino a aquellas que posea, opere, construya o adquiera.

Bajo el Art. 6 (9 L.P.R.A. sec. 2006) la Autoridad puede convenir con el Secretario del DTOP para estudiar, diseñar, construir, reparar y mantener las facilidades de tránsito. Esta es la verdadera razón por la cual la Autoridad puede hacer mejoras y reconstrucciones en carreteras estatales. Explica cómo, en el caso de autos, se realizaron algunos proyectos en la PR–30. Ahora bien, ello dista mucho de avalar la conclusión del foro de instancia. Las actuaciones contractuales de la Autoridad para proyectos específicos no activa una obligación general de mantener toda la carretera PR–30. Y aquí no se debate que en el *sector del accidente* la Autoridad nunca había realizado obra alguna.

Aunque el tribunal concluyó que tal obra debió realizarse por razón del promedio diario de vehículos (ADT), ello no es fundamento para que automáticamente la Autoridad asumiera la obligación de mejorar ese tramo de la carretera. No existe un precepto legal general de mantenimiento. Correspondía a los promoventes demostrar que había un convenio obligándola a instalar allí barreras de seguridad. *Esa prueba no se presentó.*

---

([10]) La Ley Núm. 74 de 23 de junio de 1965 (9 L.P.R.A. sec. 2001 *et seq.*) autoriza a la Autoridad, como ente jurídico, de capacidad para demandar y ser demandado. *Art. 4(g)* (9 L.P.R.A. sec. 2004(g)). Para su operación no depende de fondos aprobados por la Legislatura, sino propios. Tales fondos son mantenidos en cuentas separadas del Estado. Art. 8 (9 L.P.R.A. sec. 2008).

En resumen, no se estableció la existencia de una obligación legal general bajo el Art. 404 del Código Político, *supra*, o violación específica de la Autoridad. De los Arts. 3 y 4 de la Ley Núm. 74, *supra*, 9 L.P.R.A. secs. 2003 y 2004, no puede razonablemente extraerse una obligación de mantenimiento general de todas las carreteras del país. El ámbito de acción respecto a las facilidades de tránsito que podrán ser diseñadas, construidas y operadas por la Autoridad no permite deducirlo; menos que sea su responsabilidad.

La separabilidad, el control y la jurisdicción del Estado y de la Autoridad sobre determinadas carreteras no permiten hacer viable al Gobierno como uno solo. Tampoco imponerle responsabilidad a la Autoridad cuando no diseñó, construyó ni asumió obligación por el mantenimiento de la carretera. *Debe desestimarse la acción contra la Autoridad.*

## IV

En cuanto al Estado, notamos que la sentencia está predicada en falta de conservación y no proveer debida seguridad al viajero. Aquí se traduce en la no instalación de una barrera de seguridad.

El aspecto técnico y de seguridad del diseño de carreteras pertinente a la solución de este caso lo encontramos en el Cap. 8 del Manual de Diseño de Carreteras promulgado y publicado por el DTOP y la Autoridad de Carreteras en 1979.([11]) Aplica a aquellos proyectos de nueva construcción y los de *reconstrucción* o *mejoras* de las carreteras existentes. T.E. de 23 de enero de 1990, pág. 112.

Para evitar que algún vehículo errante cruce hacia los carriles que discurren en dirección contraria y, además, que su conductor pueda redirigirlo hacia el carril de origen,

---

([11]) Incorpora los más recientes conceptos y prácticas de diseño desarrollados por la *American Association of State Highway and Transportation Officials* (A.A.S.H.T.O.), la *Federal Highway Administration* y la *Transportation Research Board*.

existen dos (2) formas. La primera, mediante el ancho de las medianas. Se usa la distancia como espacio que permita al conductor detener con seguridad y/o maniobrar y recobrar el control del vehículo al entrar a la mediana a la velocidad operacional de cualquier carretera en particular. La norma imperante *hoy día* es hacer la mediana de treinta pies (30') de ancho. La otra, instalar barreras divisorias en las isletas medianas. Así se separa físicamente el flujo de tráfico en direcciones contrarias.

Si, como en el caso de autos, la isleta es de veinte pies (20') de ancho, cualquier reconstrucción o mejora justificaría la instalación de barreras, pues el tráfico promedio diario —*Average Daily Traffic* (ADT)— excede de veinte mil (20,000). Aquí, a base de la información recopilada por la Autoridad, el tribunal de instancia determinó que el promedio diario de tránsito vehicular durante 1983, 1984 y 1985 fueron veintidós mil novecientos veintitrés (22,923), veinticinco mil ciento setenta y nueve (25,179) y veintiséis mil novecientos cuarenta y cuatro (26,944), respectivamente.

■ Sin embargo, esas cifras no tomaron en cuenta que las máquinas instaladas no registraban vehículos sino ejes, por lo cual, habiendo algunos con más de dos (2) ejes, el número real de vehículos fue menor que el registrado.[12] Si tomamos que el perito ingeniero Cintrón calculó que un 15% representaría esos vehículos de más de dos (2) ejes (T.E. de 23 de enero de 1990, pág. 117) notamos que las

---

[12] Inicialmente el ilustrado juez sentenciador permitió que el ingeniero Castro testificara sobre hechos que afectaban la Estipulación Núm. 8, expositiva de una tabla de números que contenía "[l]as medidas del volumen de tránsito vehicular diario por los cuatro (4) carriles que componen la PR–30 ...". Caso Núm. CE-90-876, Alegato de réplica, *Exhibit* I, pág. 14. En el contrainterrogatorio del Estado y la Autoridad, Castro aclaró que las máquinas medían los vehículos, *por lo que las medidas registradas eran número de sus ejes.* Como consecuencia indicó que el número real de vehículos era *menor* al estipulado. Ennia se opuso aduciendo que el testimonio era sorpresivo por ser contrario a los hechos estipulados y que ese extremo no había sido objeto del interrogatorio directo.

Más adelante, Ennia cubrió ampliamente este aspecto a través de su perito el ingeniero Cintrón. No obstante habérsele demostrado que esa estipulación atentaba contra la realidad física y haber tenido Ennia la oportunidad de presentar prueba al efecto, el tribunal resolvió que era inadmisible. *Erró.*

anteriores cifras quedarían reducidas a veinte mil seiscientos dos (20,602), veintidós mil seiscientos treinta y dos (22,632) y veinticuatro mil doscientos diecinueve (24,219) durante los tres (3) años aludidos. No podemos ignorar esa realidad a base de que la estipulación no cualificaba el número de vehículos. Sabemos que, de ordinario, una "estipulación es una admisión judicial que implica un desistimiento formal de cualquier contención contraria a ella". *P.R. Glass Corp. v. Tribunal Superior*, 103 D.P.R. 223, 231 (1975). Sin embargo, ello no significa que inexorablemente el juzgador esté impedido de recibir prueba para precisar su alcance y conocer cualquier dato que la afecta. *La justicia no puede descansar en estipulaciones de hecho que no corresponden a la verdad.*

Por otro lado, los accidentes de tránsito son analizados a base del índice de severidad, esto es, asignando valores a los daños resultantes de un accidente. Cada fatalidad tiene un valor de doce (12), el herido tres (3) y el accidente donde sólo ocurren daños a la propiedad, uno (1). Estos índices se usan para planificar y realizar mejoras de seguridad en las intersecciones, carreteras o tramos de carreteras, urbanas o rurales, de mayor peligro. Los accidentes más típicos de carreteras a alta velocidad son de vehículos que se salen de control.[13]

Desde 1967 la Comisión para la Seguridad en el Tránsito tiene información sobre los accidentes fatales habidos en la PR–30. Durante dieciocho (18) años, hasta este accidente en 1985, inclusive, ocurrieron *sólo* noventa y seis (96) en los que murieron ciento nueve (109) personas. De estos noventa y seis (96) accidentes, las querellas policiacas existentes reflejaron que 24.3% fueron vehículos que

---

[13] Los análisis de accidentes de tránsito se clasifican tomando en cuenta: "(a) en ángulo recto (right angle); (b) de frente (head on); (c) en barrida lateral (side sweep); (d) por detrás (rear end); (e) en viraje a la izquierda (left turn); (f) con un objeto fijo (fixed-object); (g) con un peatón (pedestrian); (h) fuera de control (out of control); (i) auto virado (overturn); (j) con vehículo estacionado (parked vehicles); y todos los demás bajo la categoría de otros (others)." Caso Núm. CE-90-876, Alegato de réplica, *Exhibit* I, pág. 17.

cruzaron la isleta divisoria y murieron veintiuna (21) personas. Cuatro (4) de estos accidentes ocurrieron en los kilómetros 21.3, 21.7, 22.5 y 25.8 desde su construcción. *El accidente del caso de autos es el primero y único fatal ocurrido en el kilómetro 23.9* (y los seis (6) hectómetros). T.E. de 25 de enero de 1990, pág. 166. Tanto el DTOP como la Autoridad instalan barreras divisorias. El costo de barreras de seguridad iguales a las instaladas en la PR–30 es aproximadamente sesenta dólares ($60) el metro lineal. Ponerlas desde el kilómetro 14.8 hasta el kilómetro 26 hubiese costado como seiscientos setenta y dos mil dólares ($672,000). *La Autoridad nunca determinó ni recomendó reparaciones o mejoras a la PR–30 en el tramo entre Las Piedras y Humacao.*

�as Coincidimos con el tribunal sentenciador de que el *Manual de Diseño carece de fuerza de ley y no es obligatorio.* Constituye un punto de partida para examinar el grado de responsabilidad de la Autoridad y el DTOP en el diseño, la construcción, la mejora y el mantenimiento de las carreteras y vías en nuestra isla.

Respecto a la instalación de barreras, ya hemos indicado que en el trecho de la Carr. Núm. 30 (el del accidente), al construirse originalmente, el manual vigente no las exigía. La tesis del foro de instancia de que el DTOP debió instalarlas es errónea.

En *primer lugar*, el propio manual reconoce el elemento discrecional decisorio pues "[s]on varios los factores que pueden afectar la determinación de si se necesitan barreras y, si se justifica, cual es la barrera más adecuada para las condiciones dadas. *Los requisitos de seguridad, limitaciones económicas, limitaciones ambientales, y en algunos casos limitaciones de control de tráfico*, son todos factores que el diseñador usualmente ha de confrontar. El capítulo [8] atiende principalmente los requisitos de seguridad y las limitaciones económicas". (Sec. 8–03). La razón es sencilla.

"Todas las justificaciones se basan en la premisa de que una barrera de tráfico debe instalarse sólo si reduce la severidad de un accidente potencial. Debe hacerse todo esfuerzo en la etapa de diseño para eliminar la necesidad de barreras de tráfico, *ya que una barrera de tráfico es en sí un peligro*. Si se determina que no es necesario instalar un contracarril [valla] en un terraplén particular (es decir, que el contracarril representa un peligro mayor que el terraplén); *tal decisión continúa siendo válida irrespectivamente de que uno o mil vehículos se salgan de la vía en ese punto*." (8–03–01). A fin de cuentas, "[u]na barrera de tráfico sirve propósitos duales y frecuentemente conflictivos. La misma debe ser capaz de redirigir y/o contener un vehículo errante sin imponer condiciones intolerables sobre el vehículo y sus pasajeros." (8–03–02) (Traducción nuestra y énfasis suplido.)

La promulgación del manual en 1979 no le impuso al DTOP responsabilidad de implantar sus guías o inmediatamente poner en toda carretera estadual *existente* los aditamentos de seguridad. Concluir lo contrario sería un absurdo.

*Segundo*, la decisión de dónde la Autoridad o el DTOP va a invertir sus fondos es una que, de ordinario, recae en la sana discreción de esas agencias. Cuál carretera va a construirse, repararse o mejorarse es una determinación producto de un proceso de establecer prioridades. Dicho proceso es necesario para, dentro de los límites impuestos por los recursos disponibles, aproximarse a las metas administrativas y legislativas. Todas las carreteras no son de igual importancia, lo cual exige escoger entre los proyectos de mejoras. La experiencia de accidentes es uno de los factores que ha de ponderarse al estimar la urgencia de un proyecto de mejoras a una carretera *o a un tramo suyo*. *Introduction to Highway Transportation Engineering*, Institute of Traffic Engineers, 1968, págs. 147–149. Por esta razón, no podemos reducir la ecuación judicial al simple

análisis de costo, instalación de barreras *versus* fondos disponibles.

**Y** *tercero*, el accidente que nos ocupa fue el primero de este género en el kilómetro 23.9 (y seis (6) hectómetros). Según indicado no es posible requerir que en todo momento las avenidas, carreteras, caminos y aceras del país estén en condiciones ideales. El deber de velar porque las carreteras estatales sean seguras, ciertamente no genera el deber de instalar vallas o barreras de seguridad en toda carretera. Esa obligación se configura en aquellos sectores de carreteras que sean inherentemente peligrosas, o donde la experiencia refleje un número sustancial y repetitivo de accidentes; en otras palabras, que configuren situaciones predecibles más allá de la abstracción o fértil e ilimitada imaginación.

En síntesis, el Art. 404 del Código Político, *supra*, precepto especial que impone responsabilidad al Estado por los daños causados por falta de protección en las carreteras, se nutre de los elementos del Art. 1802 del Código Civil, *supra*. La responsabilidad por omisión al amparo de este último artículo requiere la existencia de un deber jurídico de actuar y que de haberse realizado el acto omitido se hubiese evitado el daño. *Arroyo López v. E.L.A.*, supra. En las circunstancias del caso de autos —tramo de carretera bien rotulado, recto, ancho y con buena visibilidad, que cumplía con todas las normas de seguridad vigentes al momento de su construcción, sin condiciones inherentes peligrosas ni experiencia previa de accidentes— el Estado no tenía el deber de instalar las barreras de seguridad.

Por los fundamentos expuestos, *se dictará sentencia revocatoria*.

La Juez Asociada Señora Naveira de Rodón y los Jueces Asociados Señores Hernández Denton y Alonso Alonso concurrieron con el resultado sin opinión escrita.