ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL IV

| | | |
|---|---|---|
| **BLANCA MILAGROS CURRAS AYALA**<br><br>Apelado<br><br>v.<br><br>**SUPERMERCADO ECONO LA MINA, INC., y otros**<br><br>Apelante | KLAN202400128 | **APELACIÓN** procedente del Tribunal de Primera Instancia, Sala Superior de **Bayamón**<br><br>Civil Núm.: **BY2020CV00300**<br><br>Sobre: Daños y Perjuicios |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y el Juez Ronda Del Toro.[1]

Cintrón Cintrón, Jueza Ponente.

### SENTENCIA

En San Juan, Puerto Rico, a 21 de mayo de 2024.

Comparece ante nos, Supermercado Econo La Mina y Óptima Seguros, Inc. (en conjunto, parte apelante) y solicitan la revisión de la *Sentencia* emitida el 8 de diciembre de 2023, por el Tribunal de Primera Instancia (TPI), Sala Superior de Bayamón. Mediante dicho dictamen, el TPI declaró *Ha Lugar* la *Demanda* de daños y perjuicios presentada por la señora Blanca Milagros Currás Ayala (señora Currás Ayala o parte apelada).

Por los fundamentos que expondremos a continuación, se confirma la *Sentencia* apelada.

### I.

El 22 de enero de 2020, la señora Currás Ayala presentó una *Demanda* sobre daños y perjuicios en contra del Supermercado Econo La Mina y otras partes. En la demanda alegó que, el 26 de octubre de 2019, realizaba unas compras en el Supermercado Econo La Mina del municipio de Toa Baja y al llegar al área del pasillo

---

[1]Mediante la Orden Administrativa OATA-2024-026 emitida el 20 de febrero de 2024, se designó al Hon. Eric R. Ronda del Toro a entender y votar en este caso debido a la inhibición del Hon. Fernando Rodríguez Flores.

principal sufrió una caída al resbalar en una sustancia incolora que se encontraba en el piso. Arguyó que la negligencia del supermercado se basó en no mantener en buen estado los pasillos por donde circulan clientes y empleados durante las horas de operación de la tienda. Añadió que, a causa de la caída, sufrió daños físicos considerables. Detalló que recibió tratamiento médico mediante el cual se le recetó medicamentos para el dolor. Adujo que sufrió de dolores en su cadera, espalda, brazo izquierdo y cuello. Debido a lo anterior, solicitó al Tribunal que declarara ha lugar su causa de acción y le concediera una indemnización de $150,000.00.

El Supermercado Econo La Mina y su aseguradora contestaron la demanda oportunamente, en la cual negaron unas alegaciones y aceptaron otras. Esencialmente, arguyeron que no actuaron de forma temeraria, dolosa, fraudulenta, culposa o negligente hacia la señora Currás Ayala. Sobre el tratamiento médico alegado en la demanda, estos argumentaron que ello resultaba altamente especulativo sin fundamento o razonamiento para alcanzar dichas conclusiones. Como defensas afirmativas incluyeron, entre otras cosas, que no existía causalidad entre los daños alegados y las supuestas actuaciones y omisiones de su parte. Además, que los daños alegados eran exagerados, especulativos, infundados y excesivos.

El 22 de junio de 2023 se celebró el juicio en su fondo. El desfile de prueba de la parte demandante-apelada, la señora Currás Ayala, consistió en su testimonio y el del perito médico, doctor Héctor Cortés Santos (fisiatra). La parte apelante, el Supermercado Econo y su aseguradora presentaron los testimonios de los señores Yadriel Ortiz y Juan Cortés Nieves, ambos empleados del supermercado, así como del perito doctor José Suárez Castro (cirujano ortopeda).

Evaluada la prueba, el 8 de diciembre de 2023, notificada el 11 del mismo mes y año, el Tribunal de Primera Instancia emitió la *Sentencia* que nos ocupa. En esta declaró *Ha Lugar* la demanda instada por la señora Currás Ayala y condenó a la parte apelante satisfacer la suma de $95,675.68, más intereses legales a razón del 9.25%, así como las costas y gastos del procedimiento.[2] En su pronunciamiento, el foro primario esbozó 42 determinaciones de hechos, las cuales, por su pertinencia, las citaremos, junto con sus notas al calce, *ad verbatim*:

1. La demandante, Sra. Blanca Milagros Currás Ayala, es mayor de edad, soltera y reside en Manatí, Puerto Rico.

2. El Supermercado Econo La Mina está ubicado en la Carretera 836 Km. 0.6Hm.8, Barrio Pájaros, Toa Baja, Puerto Rico.

3. Óptima Seguros es una corporación con capacidad jurídica para demandar y ser demandada. En todo momento relevante a la presente causa de acción, Óptima tenía emitida una póliza de seguro a favor de Supermercados Econo, sujeta a sus términos, cláusulas y condiciones. Dicha póliza estaba vigente para la fecha de los hechos del presente caso.[3]

4. Para la fecha de los hechos que dieron lugar al pleito, la demandante residía en Orlando, Florida, EE.UU.; y se encontraba de visita en Puerto Rico.

5. El 26 de octubre de 2019, la demandante realizaba unas compras en Econo La Mina.[4]

6. Al llegar al área del pasillo principal, la demandante sufrió una caída al resbalar en una sustancia líquida que se encontraba en el piso y que por su naturaleza incolora era imposible de visualizar.

7. El piso del establecimiento estaba sumamente cristalizado para la fecha de los hechos, lo que hacía más difícil visualizar la sustancia.

8. La demandante trató de levantarse del suelo dos (2) veces, pero volvía a resbalarse.

---

[2] También se desestimó la demanda con perjuicio respecto a LHV Holdings, LLC. y Kevic, Inc.
[3] Hecho estipulado por las partes en el "Informe sobre conferencia con antelación al juicio".
[4] Las partes estipularon el lugar, fecha y hora de los hechos en el "Informe sobre conferencia con antelación al juicio".

9. Un empleado del establecimiento, el Sr. Juan Cortés, testigo de la parte demandada, ayudó a la demandante a levantarse.

10. La demandante cayó sobre su lado y hombro izquierdo, como doblada.

11. El líquido derramado le ardía en la piel.

12. El líquido resultó ser el producto de limpieza Sacató, que se había derramado de uno de los galones ubicados para la venta en el área de la caída.

13. La demandante sintió vergüenza por lo ocurrido.

14. La demandante resultó con su ropa mojada y, por la naturaleza del producto, tuvo que ir a limpiarse al baño del establecimiento.

15. Al momento de la caída, el Sr. Yabriel Ortiz, se encontraba pasando el mapo por el derrame de Sacató.

16. El área del derrame del detergente no estaba acordonada para impedir el paso de clientes y evitar accidentes.

17. Si bien surgió de los testimonios del Sr. Juan Cortés, asistente de gerente, y del Sr. Yabriel Ortiz, empleado de mantenimiento, que en el área se había colocado un letrero alertando sobre piso mojado, ello no impedía el paso de clientes, como por ejemplo, la demandante, que podían resbalar al tratarse no de un simple derrame de agua, sino de un producto de limpieza sumamente resbaladizo.

18. Luego de la caída de la demandante, los empleados de Econo La Mina cercaron el área del derrame utilizando carritos de compra.

19. La demandante no fue la única clienta que se cayó ese día en Econo La Mina debido al derrame del producto Sacató. Según declaró el Sr. Juan Cortés, previo al accidente de la demandante, hubo otras caídas en esa misma fecha y área, por otros clientes haber resbalado debido a derrames de Sacató.

20. A pesar de haber ocurrido ese mismo día otras caídas similares a la sufrida por la demandante, Econo La Mina no tomó medidas adicionales para evitar que los clientes e invitados al establecimiento tuvieran otros accidentes.

21. El Sr. Juan Cortés entregó a la demandante un formulario para reportar el incidente, el cual ella cumplimentó.

22. La demandante prefirió marcharse del establecimiento junto a una amiga. Al llegar a la residencia, se tomó dos (2) analgésicos, pues sentía mucho dolor en el brazo y la espalda baja.

23. Luego de cambiarse de ropa, la demandante se dirigió al cuartel de la Policía en Toa Baja, donde presentó una querella por lo ocurrido.

24. Más tarde ese mismo día, la demandante tomó otro medicamento para el dolor que sentía debido a la caída.

25. Al día siguiente, 27 de octubre de 2019, la demandante acudió a la sala de emergencias del Manatí Medical Center por dolor en la cadera izquierda, hombro izquierdo y en la espalda baja, como consecuencia de la caída.

26. En la sala de emergencias del Manatí Medical Center hicieron a la demandante radiografías del hombro izquierdo, la columna lumbar y la cadera izquierda. Además, se le realizó una tomografía computadorizada (CT) de la cadera izquierda.

27. Las radiografías reflejaron que: el hombro izquierdo estaba normal; y en la columna lumbar padece de desplazamiento (anterolisthesis) de las vértebras L4 y L5. La tomografía computadorizada (CT) de la cadera izquierda reflejó que la demandante padece de artritis en el área y que el tejido tenía una inflamación moderada. Aparte de la inflamación, no se detectó una lesión mayor en la espalda debido a la caída.

28. En la sala de emergencias del Manatí Medical Center a la demandante le administraron medicamentos para el dolor y fue dada de alta.

29. Posteriormente, el 1 de noviembre de 2019, la demandante acudió a su internista, pues seguía adolorida del hombro izquierdo, la cadera izquierda y espalda baja. El internista le recetó medicamentos para el dolor y la refirió a un fisiatra, el Dr. Goveo.

30. El 8 de noviembre de 2019, la demandante acudió al Dr. Goveo, fisiatra, quien le diagnosticó bursitis en la cadera y el hombro izquierdos; y le ordenó nueve (9) sesiones de terapia física.

31. La demandante regresó a los Estados Unidos con el referido de su fisiatra para recibir las terapias allá.

32. Una vez en el estado de la Florida, el 13 de noviembre de 2019, la demandante acudió a un fisiatra para recibir tratamiento y terapias. En esa ocasión se le realizó una imagen de resonancia magnética (MRI) de la columna lumbar y la cadera izquierda. Con relación al hombro izquierdo, no obran anotaciones significativas sobre ese particular.

33. Con relación a la columna lumbar, el estudio reflejó que la demandante padece de desplazamiento (*anterolisthesis*) y espondilolistesis (*spondylolisthesis*) en las vértebras L4 y L5. Respecto

a la cadera izquierda, el estudio reflejó un edema borroso (*faint*) en el tejido blando y bursitis leve (*mild*).

34. La demandante recibió diecisiete (17) sesiones de terapia física en el hombro y cadera izquierdos.

35. La última vez que la demandante recibió tratamiento relacionado con el accidente fue en febrero de 2020.

36. La demandante declaró que decidió descontinuar las terapias físicas por temor a contagiarse con el Covid-19.

37. La demandante declaró que todavía tiene dolor en la cadera izquierda, el hombro izquierdo y la espalda baja, que no tenía previo a la caída.

38. La demandante declaró que luego del accidente no ha vuelto a tener la movilidad de antes, pues padece de dolor; en ocasiones se le dificulta realizar las tareas del diario vivir; depende de medicamentos; antes lo hacía todo en su casa y ahora depende de que otros la ayuden o de hacerlo ella poco a poco con dificultad; no puede lavar las ventanas ni tender ropa; y tiene dificultad para levantar el brazo izquierdo.

39. La demandante declaró que a veces se siente "como una persona minusválida".

40. Del testimonio del perito de la parte demandante, Dr. Héctor M. Cortés Santos, fisiatra, surgió lo siguiente:

   a. La demandante continúa con dolores en la cadera izquierda, el hombro izquierdo y la espalda baja, como consecuencia de la caída.
   b. La demandante continúa con bursitis trocantérica en la cadera izquierda.
   c. El examen que le realizó reflejó que la demandante demostró dificultad de movimiento por dolor al hacer rotación de caderas; y que el dolor por la bursitis en esa área era moderado.
   d. Con relación al hombro izquierdo, el perito indicó que la demandante puede levantar el brazo, pero pasando de noventa (90) grados, reportó que le dolía.
   e. El perito declaró que si bien la demandante tiene condiciones preexistentes, tales como desplazamiento (anterolisthesis) en las vértebras L4 y L5 y artritis en la cadera, esas condiciones eran asintomáticas previo a la caída. La demandante nunca antes había padecido de dolor. Por este motivo, el perito no consideró tales condiciones en su determinación de impedimento, sino que concluyó que las molestias y el dolor de la demandante obedecen a la caída objeto del presente caso.
   f. Por los daños ocasionados a la demandante como consecuencia de la caída, el doctor Cortés Santos le concedió un 4% de impedimento de las

funciones generales del cuerpo, desglosado de la siguiente forma: (i) síndrome de pinzamiento del hombro izquierdo – 1%; y (ii) bursitis trocantérica de cadera izquierda – 1%; y (iii) disfunción sacroilíaca izquierda – 2%.

g. El doctor Cortés Santos admitió que existen tratamientos para la bursitis, mayormente una inyección, que mejora significativamente la condición; y que la demandante no se sometió a tratamiento para esa condición. Sin embargo, señaló que un paciente tiene derecho a negarse a recibir tratamiento.

h. El doctor Cortés Santos también admitió que la artritis, condición que la demandante padece en la cadera izquierda, ocasiona dolor y que puede deberse a cambios degenerativos, pero reiteró que la demandante era asintomática previo a la caída.

41. El perito de la parte demandada, Dr. José E. Suárez Castro, cirujano ortopeda, declaró que su examen de la demandante reflejó lo siguiente:

a. La demandante tenía un leve espasmo en el hombro. Sin embargo, podía mover el brazo y hombro sin dificultad. Indicó que no coincide con el diagnóstico del doctor Cortés Santos sobre el síndrome de pinzamiento, pues la demandante no tiene esos síntomas. Indicó que, del récord médico recibido del fisiatra del estado de Florida, a tres (3) meses de la caída, no surgió síntoma alguno relacionado con el hombro izquierdo, así es que es no podría entonces tener síntomas al presente relacionados con la caída. De otra parte, explicó que el síndrome de pinzamiento provoca fricción al mover el hombro y rotar y eso eventualmente desgasta el tendón. Si fuera el caso que la demandante no hubiera mejorado del hombro, que siguiera con dolor y que no pudiera mover el hombro, lo más lógico sería que buscara ayuda, lo que tampoco ha ocurrido. A su entender, cualquier inflamación que la demandante tenga en el hombro está relacionada a cambios degenerativos y no al accidente, por eso no le aplicó un porciento de impedimento.

b. En la columna lumbar, la demandante tuvo un esguince producto de la caída. El perito declaró que usualmente esto arroja un 2% de impedimento de las funciones generales del cuerpo. Sin embargo, en esa misma región la demandante tiene condiciones preexistentes, como, por ejemplo, la espondilolistesis (*spondylolisthesis*) en las vértebras L4 y L5 y artritis. Sostuvo el perito que tales condiciones superan el 2% de impedimento por el esguince, por lo que al presente la demandante no tiene impedimento en el área lumbar relacionado con la caída. Declaró que la demandante únicamente se lastimó la espalda en la caída.

c. Con relación a la cadera izquierda, la demandante sufrió una contusión provocada por la caída. El perito no le aplicó un porciento de impedimento por entender que la demandante no ha obtenido la mejoría médica máxima (conocida como MMI, por sus siglas en inglés) ya que no ha recibido tratamiento para la bursitis. El perito explicó que el nivel de mejoría médica máxima se alcanza cuando luego que el paciente se ha sometido a los tratamientos disponibles, se concluye que no podrá mejorar. Esto no ocurrió en el caso de la demandante, pues no se ha sometido a tratamiento para bursitis. El perito admitió que al presente la demandante tiene un andar diferente, pero señaló que ello obedece a cambios degenerativos.

42. La demandante sufrió golpes en la cadera izquierda, el hombro izquierdo y la columna lumbar como consecuencia de la caída en Econo La Mina, consistentes con las conclusiones del perito de la demandante, doctor Cortés Santos en su determinación del 4% de impedimento de las funciones generales del cuerpo.

El Tribunal de Primera Instancia concluyó que el Supermercado Econo La Mina tenía la obligación y el deber de mantener las instalaciones de su supermercado en condiciones seguras y que no ocasionaran daños a sus patrocinadores. Al Tribunal le mereció credibilidad el testimonio de la demandante.

Así, el foro primario determinó que el Supermercado Econo La Mina tenía conocimiento de la condición peligrosa existente el día del incidente, basándose en el testimonio del señor Cortés Nieves, que declaró que, ese mismo día, previo al accidente de la señora Currás Ayala, ocurrieron otras caídas en la misma área debido a derrames del producto "Sacató". La juzgadora de los hechos añadió que, a pesar de tener conocimiento de lo anterior, el Supermercado Econo La Mina no tomó medida de seguridad alguna para evitar otros accidentes. En su análisis, el TPI decretó que el supermercado cercó el área del derrame del líquido con posterioridad a la caída de la señora Currás Ayala y luego de haber ocurrido caídas -ese mismo día- de otros clientes. Así, se determinó que la señora Currás Ayala

logró satisfacer los elementos de la causa de acción en daños y perjuicios por omisión.

Por último, al TPI le mereció credibilidad al testimonio del doctor Cortés Santos, el cual estableció que la señora Currás Ayala resultó con un 4% de impedimento de sus funciones generales. Así las cosas, la juzgadora de los hechos basó su análisis de valoración de daños en el precedente *Colón v. K-Mart*, 154 DPR 510 (2001), por entender que este se ajustaba más a las circunstancias particulares de la controversia concernida. A raíz de lo anterior expresó lo siguiente:

> El primer paso en nuestro proceso de actualización de la compensación es obtener el índice de precios al consumidor para el año 2001, fecha en que fue resuelto el caso precedente.[5] El índice de precios al consumidor para el año en cuestión era 84.73. El segundo paso es dividir 100 entre el índice de precios al consumidor para obtener el valor adquisitivo del dólar. Este ejercicio lleva a concluir que el valor adquisitivo del dólar para el año 2001 era $1.18. El tercer paso en nuestro análisis es multiplicar $60,000.00 (compensación concedida en el precedente utilizado) por 1.18 (valor adquisitivo del dólar), lo que nos arroja un resultado de $70,800.00. El cuarto paso es dividir la suma de $70,800.00 por el valor adquisitivo del dólar al año 2023, el cual asciende a $0.74.[6] Este proceso matemático arroja un resultado de $95,675.68, que es el valor presente de la indemnización correspondiente a la demandante por sus daños físicos, sufrimientos y angustias mentales.

Inconforme, el 22 de diciembre de 2023, el Supermercado La Mina y su aseguradora instaron una *Moción de Reconsideración.* En su comparecencia, solicitaron al foro primario la reconsideración de las determinaciones de hechos número 6, 17, 19 y 20, de forma que fueran cónsonas con la prueba presentada por las partes en el juicio. Añadieron que el Tribunal debió imponerle algún grado de negligencia comparada a la señora Currás Ayala, bajo el fundamento de que esta no actuó como una persona prudente y razonable el día

---

[5] El TPI destacó que la información utilizada para estos cómputos se obtuvo del portal del Departamento del Trabajo y Recursos Humanos en la siguiente dirección electrónica: https://www.indicadores.pr/dataset/ndice-de-precios-alconsumidor-historico.

[6] A finales de octubre de 2023, estadística más cercana disponible.

de los hechos. En cuanto a las determinaciones de hechos número 19 y 20, el Supermercado puntualizó que de la prueba testifical no se desprendía que en la misma fecha del accidente y en esa área resbalaron otros clientes por el producto "Sacató". Por ello, alegaron que el foro *a quo* partió de una premisa incorrecta sobre el conocimiento de una condición peligrosa. Reiteraron que, si bien era cierto que hubo un líquido en el piso el día de la caída de la señora Currás Ayala, también era cierto que las condiciones estaban siendo atendidas previo a dicha caída. Por último, atacó la valoración de los daños que realizó el Tribunal y especificó que se debió tomar en consideración que la señora Currás Ayala padecía de ciertas condiciones de salud preexistentes.

El 10 de enero de 2024, la señora Currás Ayala incoó una *Oposición a Reconsideración*. En su comparecencia, esbozó que el Tribunal resolvió correctamente la demanda al determinar que el Supermercado Econo La Mina no tomó las medidas necesarias para mantener el establecimiento en condiciones seguras para sus clientes, conforme lo requiere nuestra jurisprudencia. Precisó que no procedía imponer negligencia comparada porque esta no distinguió el líquido incoloro con el cual resbaló y el piso del local estaba pulido, lo cual dificultó más el poder visualizar la sustancia. La señora Currás Ayala también expresó que estaba de acuerdo con la valoración de los daños realizada por el TPI y alegó que el Supermercado n o colocó al Tribunal en posición de determinar si cometió algún error al momento de dicho ejercicio, pues no identificó aquellos casos específicos que debió tomar en consideración. Por último, la señora Currás Ayala reconoció la incongruencia de las determinaciones de hechos número 19 y 20 del Tribunal y el testimonio del señor Cortés Nieves. En esa dirección, adujo que de dicho testimonio no surgía que, en esa misma fecha, ocurrieron otras caídas en el mismo lugar. Puntualizó que lo que sí surgía del

testimonio era que, además de la caída de la señora Currás Ayala, en dicho supermercado han ocurrido al menos 2 o 3 caídas adiciones frente al *display* del producto "Sacató" por derrames. Precisó que ello en nada variaba las conclusiones y determinaciones de la *Sentencia* apelada.

Mediante *Resolución* emitida el 12 de enero de 2024, notificada el 16 de enero de 2024, el TPI declaró *No Ha Lugar* la solicitud de reconsideración del Supermercado Econo La Mina.

Aun en desacuerdo con el dictamen del TPI, el 12 de febrero de 2024, el Supermercado Econo La Mina acude ante nos mediante recurso de *Apelación*. Como parte de su comparecencia, le señala al foro de instancia la comisión de los siguientes errores:

> Primero: Erró el Tribunal de Primera Instancia al determinar que la parte demandante-apelada logró satisfacer los elementos de la causa de acción en daños y perjuicios por omisión.

> Segundo: Erró el Tribunal de Primera Instancia al no aplicarle negligencia comparada a la parte demandante-apelada.

El 26 de febrero de 2024, este Tribunal concedió mediante *Resolución*, 20 días a la señora Currás Ayala para presentar su alegato. El 15 de marzo de 2024, esta insto su escrito en oposición, por lo que, con el beneficio de la comparecencia de todas las partes, resolvemos.

## II.

### A.

El Artículo 1802 del Código Civil, 31 LPRA sec. 5141, dispone que: "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado [...]".[7] Como se sabe, para probar una causa de acción por daños y perjuicios, el promovente deberá demostrar, mediante

---

[7] Hacemos referencia al Código Civil de Puerto Rico de 1930, por los hechos haber ocurrido en la vigencia de este.

preponderancia de la prueba: (1) que se ha sufrido un daño; (2) por medio de un acto u omisión culposo o negligente; y (3) que existe un nexo causal entre la acción u omisión de la parte y el daño sufrido. *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465 (2022); *García v. E.L.A.,* 163 DPR 800, 809 (2005). Así pues, el que un demandante ostente el derecho a recibir indemnización por un alegado daño presupone la existencia de un nexo causal entre el daño y el factor que lo origina. Es decir, sólo corresponde indemnizar los daños que son consecuencia del hecho que obliga a la indemnización. *Rivera Jiménez v. Garrido & Co., Inc.,* 134 DPR 840, 851-852 (1993).

Se ha establecido que la culpa o negligencia consiste en "la falta del debido cuidado, que a la vez consiste en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias". *Pérez et al. v. Lares Medical et al.*, 207 DPR 965, 976-977 (2021); *López v. Porrata Doria*, 169 DPR 135, 151 (2006). El deber de previsión es el criterio central de la responsabilidad extracontractual. *Dworkin v. S.J. Intercont. Hotel Corp.*, 91 DPR 584, 586 (1964). Cuando se alegue haber sufrido daños como consecuencia de la negligencia de la parte demandada, el peso de la prueba respecto a la alegada negligencia le corresponde a la parte demandante. *Colón y otros v. Kmart y otros*, 154 DPR 510, 521 (2001); *Matos v. Adm. Servs. Médicos de PR*, 118 DPR 567, 569 (1987).

La negligencia por omisión surge al no anticipar aquellos daños que una persona prudente y razonable podría racionalmente prever que resultarían de no cumplir con su deber. *Colón y otros v. Kmart y otros*, supra, pág. 517. Para determinar si una omisión genera responsabilidad se considerarán los siguientes elementos: (1) la existencia o inexistencia de un deber jurídico de actuar por parte del alegado causante del daño, el incumplimiento del cual constituye

la antijuridicidad, y (2) si de haberse realizado el acto omitido se hubiera evitado el daño. *Toro Aponte v. E.L.A.*, 142 DPR 464 (1997).

En Puerto Rico rige la teoría de la causalidad adecuada para determinar el nexo causal necesario para adjudicar responsabilidad civil. La causa adecuada es la que, según la experiencia general, ordinariamente produce los daños imputados. No es otra cosa que el evento o acto que con mayor probabilidad causó el daño por el que se reclama indemnización. *Miranda v. ELA,* 137 DPR 700, 707 (1994); *Negrón García v. Noriega Ortiz,* 117 DPR 570, 575 (1984). Así pues, un daño parece ser el resultado natural y probable de un acto negligente si después del suceso, y mirándolo retroactivamente el acto que se alega ser negligente, tal daño aparece como la consecuencia razonable y ordinaria del acto. *Montalvo v. Cruz,* 144 DPR 748, 756-757 (1998), citando a *Torres Trumbull v. Pesquera,* 97 DPR 338, 343-344 (1969).

En consonancia con lo anterior, cuando una empresa mantiene abierto al público un establecimiento, con el objeto de llevar a cabo operaciones comerciales para su propio beneficio, tiene el deber de mantener dicho establecimiento en condiciones de seguridad tales que sus clientes no sufran daño alguno. *Colón y otros v. Kmart y otros,* supra, pág. 518. Los propietarios de establecimientos comerciales son responsables por los daños ocasionados a causa de aquellas condiciones peligrosas existentes, siempre que éstas sean conocidas por los propietarios o su conocimiento le sea imputable. *Íd.*; *Cotto v. C.M. Ins. Co.,* 116 DPR 644 (1985). Para que se le imponga responsabilidad, el demandante tiene que probar que el dueño no ejerció el debido cuidado para que el local fuese seguro. *Colón y otros v. Kmart y otros,* supra, pág. 519. Es decir, se tiene que probar que su daño se debió a la existencia de una condición peligrosa, que esa condición fue la que con mayor probabilidad ocasionó el daño y que ésta era conocida por el

demandado, o que debió conocerla. *Íd.* Así, les corresponde a los tribunales de primera instancia evaluar la prueba presentada y determinar en cada caso si (por preponderancia de la prueba) existía una condición peligrosa y si ésta era del conocimiento del dueño del establecimiento. *Admor. F.S.E. v. Almacén Ramón Rosa*, 151 DPR 711 (2000).

Finalmente, sabido es que la imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización. Art. 1802 del Código Civil de Puerto Rico, 31 LPRA sec. 5141. Lo anterior es conocido en nuestro ordenamiento jurídico como la negligencia concurrente o contribuyente del demandante. *Quiñones López v. Manzano Pozas*, 141 DPR 139, 178 (1996). Esta sirve para mitigar, atenuar o reducir la responsabilidad pecuniaria del demandado, pero no para eximirle totalmente de responsabilidad. *SLG Colón-Rivas v. ELA*, 196 DPR 855, 865–66, (2016), citando a H.M. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. JTS, 1986, Vol. 1, pág. 410. Esta doctrina requiere que el juzgador, además de determinar el monto de la compensación que corresponde a la víctima, establezca el porcentaje de responsabilidad o negligencia que corresponda a cada parte y reduzca la indemnización del demandante en conformidad con esta distribución de responsabilidad. *Íd.* Para determinar la negligencia que corresponde a cada parte en casos de negligencia comparada es necesario "analizar y considerar todos los hechos y circunstancias que mediaron en el caso, y particularmente si ha habido una causa predominante". *Íd.*, pág. 412. *SLG Colón-Rivas v. ELA*, supra, pág. 866.

**B.**

La tarea de estimar y valorar daños es una labor difícil, ardua y angustiosa, pues no existen fórmulas científicas que provean un

resultado exacto para indicar cómo se justiprecia el dolor y el sufrimiento causado. *Sucn. Mena Pamias et al. v. Meléndez,* 2023 TSPR 108, 212 DPR__(2023); *Herrera, Rivera v. SLG Ramírez-Vicéns,* 179 DPR 774, 791 (2010); *Vázquez Figueroa v. ELA,* 172 DPR 150, 154 (2007); *Nieves Cruz v. UPR,* 151 DPR 150, 169-170 (2000). No existe un sistema de computación que permita llegar a un resultado exacto con el cual todas las partes queden complacidas y satisfechas. *Santiago Montañez v. Fresenius Medical,* 195 DPR 476, 490 (2016). La valorización del daño descansa en la discreción, prudencia, juicio y razonabilidad del juzgador o la juzgadora de hechos motivado por un sentido de justicia y de conciencia humana. *Urrutia v. AAA,* 103 DPR 643, 647-648 (1975). Esta responde a factores únicos, por lo que debe ser considerada conforme a los hechos y circunstancias particulares de cada caso. *Nieves Cruz v. UPR, supra,* pág. 177.

Al medir el daño a ser compensado, el juzgador o juzgadora debe hacerlo a base de la prueba, procurando siempre que la indemnización no se convierta en una industria y se mantenga su sentido remediador, no punitivo. *Rodríguez Báez v. Nationwide Insurance Co.,* 156 DPR 614, 628 (2002). Por lo tanto, los tribunales deben buscar una proporción razonable entre el daño causado y la indemnización concedida, de suerte que la adjudicación sea balanceada, es decir, ni extremadamente baja ni desproporcionalmente alta. *Blás v. Hosp. Guadalupe,* 146 DPR 267, 342 (1998). *Santiago Montañez v. Fresenius Medical, supra,* pág. 490; *Meléndez Vega v. El Vocero de PR,* 189 DPR 123, 203 (2013).

En el proceso de valorización de los daños, los tribunales sentenciadores, además de examinar la prueba desfilada ante estos, deberán evaluar: "**las indemnizaciones concedidas en casos anteriores[,] [ya que estas] constituyen un punto de partida y referencia útil para pasar juicio sobre las concesiones otorgadas**

**por el foro primario. Ello es así[,] aun cuando reconocemos que no existen dos casos exactamente iguales y que cada caso es distinguible según sus circunstancias particulares.** En todo caso, estas compensaciones otorgadas en casos anteriores deben ajustarse a su valor presente." *Sucn. Mena Pamias et al. v. Meléndez,* supra*,* citando a *Santiago Montañez v. Fresenius Medical,* supra, pág. 491. (Énfasis suplido). La jueza o el juez sentenciador no puede descansar meramente en un cálculo matemático. *Íd.*

Cónsono con lo anterior, el juzgador o la juzgadora tiene la obligación de especificar la jurisprudencia que utilizó como guía para valorar los daños al igual que el cómputo realizado para ajustar las cuantías de casos anteriores a su valor actual y el caso que se encuentre adjudicando. Es forzoso explicar qué casos se utilizan como referencia y cómo las cuantías concedidas se ajustan en esos casos anteriores al caso que el tribunal tiene ante su consideración. *Santiago Montañez v. Fresenius Medical,* supra, pág. 493.

### C.

Como es sabido, los foros revisores no debemos intervenir con las determinaciones de hechos de los jueces sentenciadores, salvo que medie error manifiesto, pasión, prejuicio o parcialidad y, por ende, abuso de discreción. *Sucn. Mena Pamias et al. v. Meléndez*, supra, citando a *Pueblo v. Hernández Doble,* 210 DPR 850 (2022); *Cruz Flores et al. v. Hospital Ryder et al.*, supra y *SLG Fernández-Bernal v. RAD-MAN et al.*, 208 DPR 310, 338 (2021). También los foros revisores pueden intervenir con dichas determinaciones cuando entienda que la cuantía concedida resulte ridículamente baja o exageradamente alta. *Santiago Montañez v. Fresenius Medical*, supra, pág. 490; *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 203 (2013); *Rodríguez et al. v. Hospital et al.*, supra, pág. 909. La deferencia que se le otorga a las determinaciones de los tribunales sentenciadores se basa en que, ciertamente, es el aludido

foro el que tiene contacto directo con la prueba testifical presentada y, por ende, el que está en mejor posición de emitir un juicio sobre la valorización de los daños. *Sucn. Mena Pamias et al. v. Meléndez,* supra, *Santiago Montañez v. Fresenius Medical,* supra, págs. 490–491.

**III.**

Por estar intrínsecamente relacionados, discutiremos en conjunto los señalamientos de error levantados por la parte apelante. Veamos.

La parte apelante alega que el TPI erró al dictar la *Sentencia* apelada. Aduce que cumplió con su deber como establecimiento comercial de mantener sus facilidades en condiciones seguras para sus visitantes. Específicamente, arguye que la parte apelada incumplió con su obligación de presentar prueba que colocara al foro primario en condiciones de determinar que, como establecimiento, no ejerció el debido cuidado para que el local fuese seguro. Además, razona que durante el juicio desfiló prueba testifical que estableció que, previo al accidente de la señora Currás Ayala, se llevaron a cabo medidas de seguridad para resolver el derrame del líquido Sacató. Así, esboza que no se probó mediante preponderancia de la prueba que hubo omisión por su parte, por lo que es su parecer que no se le debe responsabilizar totalmente por la caída de la señora Currás Ayala acaecida en sus predios.

Por otro lado, la parte apelante argumenta que las determinaciones de hechos número 19 y 20 del TPI estuvieron basadas erróneamente en prueba que nunca se presentó en el juicio. En particular, alega que, de los testimonios del señor Cortés Nieves y del señor Ortiz, no se desprende que en la fecha del accidente y en esa área ocurrieron otros accidentes por derrame del líquido "Sacató". Menciona que lo anterior fue admitido por la propia parte apelada en su oposición a la solicitud de reconsideración. Por

consiguiente, entiende que la responsabilidad que pretende imputársele, al no estar sustentada con la prueba presentada y admitida, debe ser revocada por este Foro. Resaltan que, tal y como testificaron los señores Cortés Nieves y Ortiz, luego de derramado el líquido en el pasillo se tomaron varias medidas de seguridad para evitar accidentes tales como: (1) colocaron un letrero de "piso mojado"; (2) colocaron un carrito de limpieza y (3) se mantuvo un empleado limpiando el área. En suma, entiende que la parte apelada no logró satisfacer los elementos de una causa de acción en daños y perjuicios por omisión.

En cuanto a las determinaciones de hechos 19 y 20, luego de analizar puntillosamente la transcripción del juicio en su fondo, en efecto estas no son correctas. De hecho, la propia parte apelada admite dicho error en sus escritos. Ahora bien, somos del parecer que ello no tuvo un efecto en la decisión arribada por el foro primario. Lo cierto es que los testimonios de los empleados del supermercado y la credibilidad que le merecieron a la juzgadora de los hechos establecieron que el 26 de octubre de 2019 el Supermercado Econo La Mina falló en mantener sus pasillos seguros tras un derrame del producto líquido Sacató. Como consecuencia, la señora Currás Ayala sufrió la caída concernida.

Según expuesto, existe responsabilidad por omisión si de haberse llevado a cabo el acto omitido se hubiera evitado el daño. En este caso es claro que el Supermercado Econo La Mina tenía el deber jurídico de actuar, pues, como establecimiento comercial, debe mantener sus áreas bien cuidadas en beneficio de su clientela para que estos no sufran algún daño. En la presente causa, la parte apelante sufrió un daño a consecuencia de una condición peligrosa existente en el lugar de los hechos, específicamente en uno de los pasillos del supermercado. Según la prueba testifical desfilada, en dicho pasillo existía un líquido en el piso en el cual la parte apelada

se resbaló y se cayó. La prueba es suficiente para adjudicar responsabilidad a la parte apelante. Al TPI le mereció credibilidad el testimonio de la parte apelada quien fue enfática en establecer que no existía rótulo alguno que le alertara que en ese pasillo existía un peligro.

Por último, y en la alternativa, la parte apelante aduce que la parte apelada no ejerció prudencia ante la presencia de elementos que le alertaban sobre el derrame. Ante ello, esboza que el TPI erró al no imponerle algún porciento de negligencia comparada. No tiene razón.

Según surge del expediente, la señora Currás Ayala se dirigió por el pasillo principal en busca de los artículos que necesitaba y mientras miraba hacia al frente se resbaló y cayó al suelo.[8] Asimismo, se desprende que, al caerse la perjudicada percibió que había un líquido derramado, el cual era una sustancia gelatinosa, viscosa, completamente transparente. El piso del pasillo, además, estaba sumamente cristalizado, por lo que apenas se podía diferenciar que había un derrame en el lugar.[9] Esta añadió que en el momento que ella discurría por el pasillo no había nada que obstruyera el paso, nada que identificara el área como que había piso mojado.[10] Ante dichas circunstancias, resulta evidente que una persona prudente tampoco hubiese distinguido el peligro que representaba el piso mojado en el pasillo del supermercado. Más aun, cuando, a base de la prueba oral que le mereció credibilidad al Tribunal, no existían letreros que le sugirieran a la señora Currás Ayala la presencia de la condición peligrosa preexistente.

---

[8] Transcripción de la Prueba Oral (TPO), pág. 54 del apéndice del recurso.
[9] Íd.
[10] Íd., pág. 56.

Examinada la totalidad de la prueba, junto al dictamen del Tribunal de Primera Instancia, concluimos que dicho foro actuó correctamente al no aplicar la doctrina de negligencia comparada.

En fin, es por todos conocidos que el foro primario es el que tiene contacto directo con la prueba testifical presentada y, por ende, el que está en mejor posición de emitir un juicio sobre la valorización de los daños. *Sucesión José Emanuel Mena Pamias y otros v. Jiménez Meléndez y otros*, supra, citando a *Santiago Montañez v. Fresenius Medical*, supra, págs. 490-491.

En cuanto a lo anterior, nuestro más alto foro ha dispuesto que los foros revisores no deben intervenir con las determinaciones de hechos de las juezas y los jueces sentenciadores, salvo que medie error manifiesto, pasión, prejuicio o parcialidad y, por ende, abuso de discreción. *Pueblo v. Hernández Doble*, 210 DPR 850 (2022); *Cruz Flores et. al. v. Hospital Ryder et. al.*, 210 DPR 465 (2022).

Así las cosas, no está presente aquí el escenario de pasión, prejuicio, parcialidad o error manifiesto que hubiese podido motivar la intervención de este Tribunal de Apelaciones en la determinación del Tribunal de Primera Instancia.

## IV.

Por los fundamentos antes expuestos, confirmamos la *Sentencia* apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones