ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| STEPHANIE RÍOS VÉLEZ<br><br>Apelante<br><br>v.<br><br>CC1 COMPANIES CORP.<br><br>Apelados | KLAN202300902 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de Fajardo<br><br>Civil Núm.:<br>CA2018CV00279<br><br>Sobre:<br>Daños y Perjuicios |

Panel integrado por su presidenta, la Jueza Domínguez Irizarry, la Jueza Grana Martínez y el Juez Campos Pérez[1]

Campos Pérez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 19 de septiembre de 2024.

Comparece la parte demandante y apelante, Sra. Stephanie Ríos Vélez (en adelante, señora Ríos Vélez), mediante un recurso de apelación. Solicita la revocación de la *Sentencia* emitida el 30 de agosto de 2023, notificada el 1 de septiembre de 2023, por el Tribunal de Primera Instancia, Sala de Fajardo (en adelante, TPI). En el referido dictamen, el TPI declaró no ha lugar la reclamación civil instada por la compareciente en contra de la parte demandada y apelada, CC1 Companies Corp. (en adelante, CC1).

Anticipamos la confirmación de la determinación judicial impugnada por los fundamentos que expondremos más adelante.

**I.**

La presente causa se inició el 19 de marzo de 2018, ocasión en que la señora Ríos Vélez presentó una *Demanda* en contra de CC1, CC1 Foods Corp., Kikuet Corp. y otros demandados de nombres desconocidos.[2] Luego del diligenciamiento del emplazamiento de CC1 el 5 de abril de 2018, la señora Ríos Vélez

---

[1] Mediante Orden Administrativa OATA-2023-212 de 6 de diciembre de 2023 se designó al Juez José Ignacio Campos Pérez, en sustitución del Hon. Alberto L. Pérez Ocasio.
[2] Apéndice, págs. 1-5.

Número Identificador

SEN2024_____

instó *Demanda Enmendada* el 13 de junio de 2018, con el propósito de incluir como parte demandada a Century Frozen Foods, LLC.[3] En esencia, la demandante alegó que, el 29 de junio de 2017, en horas de la tarde, se encontraba trabajando en una carpa de promociones para la convención de Supermercados Econo, en el hotel Wyndham Grand Río Mar Beach Resort & Spa, de Río Grande, específicamente en las inmediaciones de un torneo de golf. Adujo que, cuando se prestaba a solicitar comida en la carpa de los demandados, comenzó a soplar un viento fuerte. Ello ocasionó que una bandeja de aluminio se volteara y su contenido cayera en el área de su pelvis y ambos muslos, lo que le causó serias quemaduras en la zona afectada. La demandante imputó descuido y crasa negligencia a los demandados, por tener la bandeja con agua hirviendo, sin protector de seguridad y expuesta al viento constante que fluía en el lugar. La señora Ríos Vélez sostuvo que los alegados actos negligentes le provocaron lesiones físicas, angustias mentales y un menoscabo económico; daños que estimó resarcibles por la suma global de $355,760.00.

CC1 presentó *Contestación a Demanda Enmendada* el 14 de agosto de 2018.[4] Afirmó que todas las compañías demandadas operaban bajo la corporación CC1. A pesar de que reconoció tener cierto conocimiento del incidente, sujetó al descubrimiento de prueba las alegaciones de la reclamación. Por igual, luego de negar haber incurrido en negligencia, CC1 aseveró que la parte responsable de cualquier daño alegado por la demandante era Stylus Promo Group, Inc. (en adelante, Stylus). A esos fines, el 16 de julio de 2018, CC1 había incoado una *Demanda Contra Tercero*, con el fin de incluir a Stylus al pleito.[5] El emplazamiento fue expedido el 20 de julio de 2018.[6] En síntesis, CC1 sostuvo que,

---

[3] Apéndice, págs. 7-11.
[4] Apéndice, págs. 16-20.
[5] Apéndice, págs. 14-15.
[6] Entrada 26 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC).

de ser correctas las alegaciones de la demandante, entonces, la negligencia y responsabilidad de los daños sufridos por la señora Ríos Vélez recaía sobre Stylus, quien tuvo el control, operación, administración y uso de la carpa donde ocurrió el incidente.

Ahora, CC1 no diligenció oportunamente el emplazamiento a Stylus. Por consiguiente, el TPI dictó una *Sentencia Parcial*[7] mediante la cual desestimó sin perjuicio la reclamación contra el tercero, al amparo de la Regla 4.3 (c) de las de Procedimiento Civil.[8] Posteriormente, el 21 de junio de 2019, CC1 presentó un pleito distinto contra Stylus y su aseguradora MAPFRE Insurance Company (RG2019CV00365), el cual fue consolidado con el del epígrafe.[9] No obstante, la causa fue desestimada por prescripción, por virtud de una *Sentencia Parcial* emitida el 11 de septiembre de 2020 y notificada el día 17 siguiente.[10]

Así las cosas, el 9 de agosto de 2023, los litigantes sometieron en conjunto el *Informe de Conferencia con Antelación al Juicio Enmendado*.[11] Allí, estipularon los siguientes hechos y documentos:

1. La corporación codemandada CC1 COMPANIES, CORP es una corporación debidamente autorizada para hacer negocios en P.R., con capacidad de ser demandada.

2. Autenticidad de Récords médicos del Hospital Industrial [de la Corporación del Fondo del Seguro del Estado (CFSE)] (Stephanie Ríos) debidamente certificados.

3. El 29 de junio de 2017 la demandante, Stephanie Ríos se encontraba trabajando como promotora contratada por Wave Promotions para la convención de una cadena de supermercados en el Hotel Wyndham Grand Rio Mar Beach.

---

[7] Apéndice, págs. 21-23.
[8] 32 LPRA Ap. V, R. 4.3 (c).
[9] Entrada 63 del SUMAC.
[10] Apéndice, págs. 30-37. El 22 de octubre de 2019, la señora Ríos Vélez solicitó enmendar su reclamación con el fin de unir como demandados a Stylus y a MAPFRE. La aseguradora se opuso. El TPI denegó la petición. Nótese que, aun cuando la señora Ríos Vélez hubiera advenido en conocimiento de la participación de Stylus el 16 de julio de 2018, fecha tardía en que se interpuso la *Demanda Contra Tercero,* a la fecha de su solicitud, en octubre de 2019, su plazo prescriptivo de un año también había expirado. Refiérase al Apéndice, págs. 24-25; 26-28 y entradas 73 y 74 del SUMAC.
[11] Apéndice, págs. 63-75.

4. Autenticidad del reporte de los paramédicos que transportaron a Stephanie Ríos al Centro Médico.

La vista en su fondo se celebró el 28 de agosto de 2023.[12] Testificaron Jessica Rocafort (en adelante, señora Rocafort), la señora Ríos Vélez y el representante del demandado, señor Aníbal González Franco (en adelante, señor González Franco).

Luego de justipreciar la prueba vertida en el juicio, el TPI emitió su dictamen. En éste, declaró no ha lugar la reclamación del título.[13] Argumentó que, si bien "una intensa ráfaga de viento es un hecho previsible en las áreas costeras cuando el tiempo está lluvioso", la demandante no "probó la existencia de una acción culposa o negligente por parte del demandado CC1 Companies Corp".[14]

No conteste, la señora Ríos Vélez instó una *Moción de Reconsideración*.[15] Insistió en la responsabilidad de CC1 toda vez que el demandado no cuestionó ni le proveyó instrucción alguna a Stylus acerca de las medidas de seguridad a ser implementadas en la carpa. Indicó, además, que el TPI debió considerar la doctrina de responsabilidad por actos de terceros. Evaluados los argumentos, el 12 de septiembre de 2023, el TPI declaró no ha lugar la petición de la demandante.[16]

Inconforme aún, el 11 de octubre de 2023, la señora Ríos Vélez presentó el recurso apelativo de autos y esbozó los siguientes errores:

> ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DICTAR SENTENCIA CONTRA LA PARTE DEMANDANTE-APELANTE CUANDO SE DEMOSTRARON TODOS LOS ELEMENTOS DE UNA CAUSA DE ACCIÓN DE DAÑOS Y PERJUICIOS EN CONTRA DE LA PARTE DEMANDADA.

---

[12] Apéndice, págs. 76-77. En cuanto a la prueba documental de la parte demandante, véase el Apéndice, págs. 95-96; 97-297. Con relación a la prueba documental de la parte demandada, refiérase al Apéndice, págs. 54; 55-62.
[13] Apéndice, págs. 81-85.
[14] Apéndice, pág. 84.
[15] Apéndice, págs. 86-93.
[16] Apéndice, pág. 94.

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DICTAR SENTENCIA CONTRA LA PARTE DEMANDANTE-APELANTE SIN TOMAR EN CONSIDERACIÓN LA DOCTRINA DE RESPONSABILIDAD POR ACTOS DE TERCEROS.

El 12 de abril de 2024, CC1 unió su postura al expediente ante nos mediante el *Alegato en Oposición a Apelación*. Con el beneficio de su comparecencia y la Transcripción de la Prueba Oral presentada el 13 de febrero de 2024, resolvemos.

**II.**

**A.**

El Tribunal Supremo de Puerto Rico ha enfatizado la deferencia que los foros apelativos debemos conferir a la apreciación de la prueba testifical que realiza el juzgador o la juzgadora de hechos. *McConnell v. Palau,* 161 DPR 734, 750 (2004); *Argüello v. Argüello,* 155 DPR 62, 78-79 (2001); *López Vicil v. ITT Intermedia Inc.,* 142 DPR 857, 864 (1997). En ese sentido, el alto foro ha enunciado que "la tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz". *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 771 (2013), reiterado en *Gómez Márquez et al. v. El Oriental,* 203 DPR 783, 792 (2020). En atención a esto, como regla general, **los tribunales apelativos no debemos intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que haya efectuado el tribunal sentenciador**. Tampoco ostentamos facultad para sustituir las determinaciones del foro de primera instancia por nuestras propias apreciaciones. *Gómez Márquez et al. v. El Oriental, supra,* pág. 793; *Serrano Muñoz v. Auxilio Mutuo,* 171 DPR 717, 741 (2005).

No obstante, debe recordarse que el arbitrio del juzgador o la juzgadora de hechos, si bien es respetable, no es absoluto y una "apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora" de los foros revisores. *Dávila Nieves v. Meléndez Marín, supra*, págs. 771-772. Por tanto, podemos intervenir excepcionalmente con la apreciación de la prueba si el foro revisado incurrió en pasión, prejuicio, parcialidad o error manifiesto. *Rolón v. Charlie Car Rental, Inc.*, 148 DPR 420, 433 (1999) y los casos allí citados. Se incurre, por ejemplo, en un error manifiesto cuando la apreciación de la prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble. *Gómez Márquez et al. v. El Oriental, supra*, págs. 793-794.

**B.**

**(i)**

El hoy derogado Artículo 1802 del Código Civil de 1930, 31 LPRA ant. sec. 5141, pero vigente a los hechos acontecidos el 27 de junio de 2017,[17] disponía que todo aquél que por acción u omisión cause un daño a otro vendrá obligado a repararlo, si ha mediado culpa o negligencia. Para poder reclamar daños y perjuicios bajo este precepto, el Tribunal Supremo ha expresado que el demandante debe establecer la existencia de tres requisitos: (1) la existencia de un daño real; (2) **el nexo causal entre daño sufrido y la acción u omisión del demandado**; y (3) que el acto u omisión es culposo o negligente. *Pérez et al. v. Lares Medical et al.*, 207 DPR 965, 976 (2021); *López v. Porrata Doria*, 169 DPR 135, 150 (2006).

Respecto al concepto de culpa y negligencia, nuestro más alto foro ha opinado que consiste en la:

> falta del debido cuidado, que a la vez consiste en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona

---

[17] Véase, Artículo 1815 del Código Civil de 2020, 31 LPRA sec. 11720, el cual dispone, en parte, que "[l]a responsabilidad extracontractual, tanto en su extensión como su naturaleza, se determina por la ley vigente en el momento en que ocurrió el acto u omisión que da lugar a dicha responsabilidad. [...]".

prudente habría de prever en las mismas circunstancias. *López v. Porrata Doria, supra*, pág. 151; *Toro Aponte v. E.L.A.*, 142 DPR 464, 473 (1997).

Por otro lado, **la omisión genera responsabilidad civil extracontractual siempre y cuando dicha omisión constituya una conducta antijurídica imputable**. *Hernández Vélez v. Televicentro*, 168 DPR 803, 812 (2006); *Arroyo López v. E.L.A.*, 126 DPR 682, 686 (1990). Para determinar si se incurrió o no en responsabilidad civil por omisión, el Tribunal Supremo ha enunciado que deben considerarse los siguientes factores: (i) la existencia o inexistencia de un deber jurídico de actuar por parte del alegado causante del daño y (ii) si de haberse realizado el acto omitido se hubiera evitado el daño. *Hernández Vélez v. Televicentro, supra*, pág. 812.

Nuestro ordenamiento establece, además, que **el deber de indemnizar presupone la existencia de un nexo causal**. *Estremera v. Inmobiliaria Rac, Inc.*, 109 DPR 852, 856 (1980). La relación causal entre el acto negligente y los daños producidos debe ser **suficiente en Derecho**. *López v. Dr. Cañizares*, 163 DPR 119, 133 (2004). En Puerto Rico rige la doctrina de la causalidad adecuada. *Pérez et al. v. Lares Medical et al., supra*, pág. 977; *López v. Porrata Doria; supra*, pág. 151. Esta doctrina dicta que "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". *Pérez et al. v. Lares Medical et al., supra*, pág. 977; *López v. Porrata Doria;* págs. 151-152. En otras palabras, la cuestión se limita a determinar si la ocurrencia del daño era de esperarse en el curso normal de un suceso o si, por el contrario, éste queda fuera del cálculo. *Rivera Jiménez v. Garrido & Co. Inc.*, 134 DPR 840, 852 (1993). Así, pues, para determinar cuál fue la causa del daño, el demandante tiene que probar que el acto culposo o la omisión negligente del demandado fue lo que, con mayor

probabilidad, ocasionó el perjuicio reclamado. *Santiago v. Sup. Grande*, 166 DPR 796, 819 (2006).

**(ii)**

En lo que atañe al caso del título, el Tribunal Supremo de Puerto Rico ha explicado la figura del contratista independiente como sigue:

> [c]uando la persona que emplea a **otra puede prescribir lo que se ha de hacer, pero no cómo ha de hacerse ni quién lo hará**, la persona que se obligue a hacer el trabajo es un 'contratista' (*contractor*) y no un 'empleado' (*servant*), aunque el trabajo haya de realizarse bajo la dirección y a satisfacción de personas que representan al que emplea. (Énfasis nuestro). *Atiles, Admor. v. Comision Industrial*, 68 DPR 115, 120 (1948).

De ordinario, "[l]a responsabilidad impuesta a un empleador por los daños ocasionados por un contratista independiente constituye una excepción a la norma a los efectos de que la obligación de reparar daños generalmente emana de un hecho propio. **Nuestro ordenamiento únicamente impone responsabilidad por hechos ajenos de manera excepcional**". (Énfasis nuestro). *Pons v. Engebretson*, 160 DPR 347, 356 (2003); véase Art. 1803 del Cód. Civil de 1930, 31 LPRA ant. sec. 5142. El empleador o principal, que contrata a un contratista independiente, será responsable solidariamente del daño que éste cause por su propia negligencia en la ejecución del trabajo si dicho daño fuera un riesgo previsible para el empleador o principal y éste omitió tomar las precauciones especiales que se requerían, en vista de los riesgos particulares de una obra. *López v. Gobierno Mun. de Cataño*, 131 DPR 694, 706 (1992); *Martínez v. Chase Manhattan Bank*, 108 DPR 515 (1979). Ahora bien, **el empleador del contratista no responde** por la **negligencia corriente** de éste, que resulte en daños a terceros, ni por la **inobservancia de precauciones de rutina**, que un **contratista cuidadoso debe usualmente tomar**. La responsabilidad del empleador gira en torno a **riesgos peculiares al**

**trabajo que deba realizarse** y que surgen de su naturaleza, contra los cuales una persona razonable reconocería la **necesidad de tomar precauciones especiales**. *Martínez v. Chase Manhattan Bank, supra,* págs. 522-523. A modo de ejemplos sobre los riesgos especiales que requieren un alto grado de cuidado, el Tribunal Supremo se ha referido a las labores relacionadas con la energía eléctrica y con el manejo de sustancias inflamables. Véase, *Pacheco v. A.F.F.,* 112 DPR 296 (1982); *Vda. de Delgado v. Boston Ins. Co.,* 99 DPR 714 (1971). "Ahora bien, **como no se trata de una norma de responsabilidad absoluta, no es necesario que se prevean todos los riesgos probables que pueda generar la actividad**". *Pons v. Engebretson, supra,* pág. 358.

Según compete a este caso, tampoco responde el principal o empleador por la negligencia del contratista independiente "cuando ejerza la debida diligencia para asegurarse que **la persona contratada cuenta con las destrezas y experiencia suficientes para llevar a cabo el trabajo**, por lo que es de esperar que tomará las medidas de precaución necesarias para evitar los riesgos que pueda ocasionar la obra. En tales circunstancias, **se entenderá que el empleador ha actuado como un hombre prudente y razonable al delegar las labores en una persona capacitada para llevar a cabo el trabajo**". (Énfasis nuestro). *Pons v. Engebretson, supra,* págs. 358-359.

Por consiguiente, al determinar si un empleador responde o no por los actos torticeros de su contratista independiente, habrá de observarse si el trabajo o servicio pactado podía o no crear un riesgo peculiar de daños a terceros; si, al momento de contratar al contratista independiente, el empleador previó dicho riesgo y adoptó precauciones especiales **o procuró contratar a un contratista independiente perito, de quien se espera que tomaría las**

**medidas de precaución necesarias para prevenir los riesgos inherentes a la obra o servicio**.

## III.

En la presente causa, la señora Ríos Vélez plantea que el TPI incidió al establecer que no se probaron los elementos de la causa de acción por daños y perjuicios en contra de CC1. Añade que el TPI debió considerar la doctrina de responsabilidad por actos de terceros para que el apelado respondiera por las acciones u omisiones de Stylus; o como mínimo, que adjudicara los porcentajes de culpa y negligencia entre el principal y el contratista independiente. Por su relación intrínseca, discutiremos en conjunto los señalamientos de error. Antes, repasemos la prueba testifical vertida en el juicio.

### *Jessica Rocafort*

La testigo, al igual que la apelante, participó de la actividad el 29 de junio de 2017 en calidad de promotora. "En Río Mar, que es, como un *beach resort*, y tiene un campo de golf donde las promociones se llevan a cabo cuando surgen promociones de torneos de golf".[18] Con relación a la carpa que promocionaba los productos del apelado, la declarante explicó:

> R. Es una carpa donde había una mesa, de esas que se doblan, que son plásticas, eh, con, con estas bandejas de aluminio que tienen agua caliente y como unos encendedores abajo...
>
> Juez. Tengo una pregunta. ¿Eran las bandejas del tipo de bandejas que se doblan, o eran las bandejas de aluminio del tipo restaurant que son duras?
>
> R. Las que se doblan.[19]

Las bandejas desechables contenían "empanadillitas y comida para picar".[20] Indicó que los alimentos en la carpa de Kikuet fueron confeccionados por un hombre joven lisiado de un brazo, a quien

---

[18] Transcripción de la Prueba Oral (TPO) página 16 líneas 9-11.
[19] TPO pág. 18 líneas 9-17.
[20] TPO pág. 19 líneas 4-7.

había visto en promociones anteriores. En éstas, declaró que, como en eventos previos, el empleado estuvo friendo las empanadillas con el mismo equipo. En éstos no ocurrieron incidentes.[21]

> P. [...] Y una vez el joven terminaba de freír esos productos, ¿dónde se colocaban esos productos?
>
> R. Pasaban de una bandeja de plástico que ten[í]a papel toalla a otras que estaban en la mesa de plástico.
>
> P. Okey. ¿A las bandejas de aluminio?
>
> R. Sí.
>
> P. OK. Y para mantener caliente esas bandejas de aluminio, utilizaban otras bandejas.
>
> R. ¿Para mantener caliente...? Sí, porque él les ponía, lo que freía lo ponía en una bandeja de aluminio, y de esa como que la viraba y la ponía en otras bandejas que ya estaban en la mesa con su agua caliente y el *lighter*.
>
> P. *Sterno* le llaman. ¿Cuántas bandejas habían [*sic*] ese día?
>
> R. Como tres.[22]

Al describir las condiciones atmosféricas acotó la declarante:

> R. Pues el día estuvo bastante bien hasta que ya empezaba la tarde y vimos una nube gris empezando a acercarse, ya nosotros estábamos a punto de culminar, verdad, lo que es la promoción. *So*, vemos que se acerca la nube, empieza un poco, mucho viento, y todos nos juntamos en el medio para tratar de alguna forma u otra que no, que las cosas no se vayan volando, porque las servilletas se estaban volando, las cosas estaban volando, y **tratamos de mantener, nosotras, las chicas, en general todo bajo control**.
>
> .        .        .        .        .        .        .        .
>
> Pues, **fue un viento muy fuerte**.[23] (Énfasis nuestro).

Por igual, la testigo confirmó su declaración prestada en la deposición sobre que el viento fuerte fue súbito, "en fracciones de segundo ocurre la situación".[24]

### Stephanie Ríos Vélez

La descripción de las condiciones climatológicas fue refrendada por la apelante. La señora Ríos Vélez declaró que, en la

---

[21] TPO págs. 21 líneas 10-15; 30 líneas 3-8; 32 líneas 1-22; 33 línea 1.
[22] TPO págs. 34 líneas 4-22; 35 líneas 1-2.
[23] TPO pág. 22 líneas 8-15, 20.
[24] TPO pág. 40 líneas 12-22.

mañana, el día estuvo soleado, pero que al mediodía comenzó "a tornarse nublado y empezó a llover, empezó a, el viento.[25] "Estaba fuerte, porque obviamente es un campo abierto, está cerca del mar y pues los vientos son más fuertes y más directo a nosotros".[26]

Sobre los hechos de 29 de junio de 2017, expresó:

P. ¿Usted nos puede describir el área en donde usted estaba trabajando?

R. Pues yo recuerdo que era en el mismo campo abierto, en uno de los hoyos, no recuerdo el número, porque ya, bastante tiempo, pero sí estaba en una [*sic*] área que pasaban los jugadores y era en uno de los hoyos en el campo.

.        .        .        .        .        .        .        .

P. ¿Qu[é] otras carpas habían [*sic*] en el área?

R. Pues, al lado mío estaba…, estaba la carpa de Kikuet, y la de Coca-Cola que era la de (ininteligible). Estaba todo, o sea, estaban las carpas, pero la que estaba al lado mío era la de Kikuet.

P. ¿Nos puede describir esa carpa que usted menciona de Kikuet?

R. Pues era una carpa normal, este, con una mesa, este, como las que se usan de cumpleaños, que son plásticas, eh, tenían sus productos. Estaban disgustando [*sic*] la comida, y (ininteligible) era parte de Coca-Cola, era (ininteligible), es una barra como nevera donde tienen todos sus productos.

.        .        .        .        .        .        .        .

R. Eh, yo, yo me tocaba, me tocaba, a nosotras nos dan como un *break* para, para comer y pues, la mayoría de las veces nuestros, las personas, los supervisores nos dan un *break* como de 15 minutos para nosotras poder comer algo porque estamos desde las 6:00 de la mañana trabajando en ese evento de torneo, y pues me tocó poder ir a comer; me acerco a la carpa, eh, ya el clima, ya estaba empezándose a tornar lluvioso, o sea, ya estaban los vientos, ya se estaba poniendo negro el cielo. Eh, pues ya, todos nosotros, como por cosa de humanos, nos vamos dentro de la carpa a quedarnos a, como dicen, a acamparnos o no mojarnos ahí. Pues, yo me voy por la parte de atrás, porque pues porque estaba lleno de jugadores y de empleados y de promotoras. O sea, se habían parado varios jugadores.

.        .        .        .        .        .        .        .

R. **Pues yo me iba a, yo iba a ir a comer, pero, este, ahí mismo surgió lo del viento y se viró la bandeja**. Yo traté de, obviamente mis reflejos, de echarme para atrás, pero fue tanto que, fue tan cerca que yo estaba que no me dio tiempo de echarme completamente para

---

[25] TPO pág. 54 líneas 1-9.
[26] TPO pág. 120 líneas 2-4.

atrás. Si no me hubiera echado para atrás me hubiera caído desde arriba.

P. ¿Qué te hubiese caído, qué tenía esa bandeja, que mencionas?

R. La comida y el agua. Como estaba semi vacía, el viento hizo que se subiera. O sea, que no tuviera ese peso de la comida que se pudiera, que tuviera con que mantener.[27] (Énfasis nuestro).

La apelante narró que comenzó a llorar y a gritar de dolor. Intentó quitarse la ropa y se echó encima el contenido de una nevera de hielo. A preguntas de su representación legal, la apelante indicó que no vio ningún aviso sobre medidas de precaución ni un protector frente a las bandejas.[28] Entonces, uno de los jugadores de golf la auxilió y la trasladó al área de seguridad del hotel a esperar la ambulancia, donde le colocaron unas compresas frías en ambos muslos y las ingles.[29]

La señora Ríos Vélez continuó su testimonio, en el que aludió a los daños morales y pecuniarios sufridos y a ciertas situaciones que afectaron su entorno familiar, durante y después de su hospitalización de veinte días. Describió el doloroso tratamiento de sus quemaduras y la necesidad de que la asistieran hasta para asearse. Las lesiones requirieron la remoción de la piel quemada dos veces al día, lo que provocó que sintiera que se quemaba de nuevo, aun cuando le administraban anestesia. Además, necesitó tratamiento ambulatorio durante otros seis meses, hasta inicios de 2018. La testigo declaró que ha desarrollado temor y ansiedad cuando ve cosas calientes y no ha vuelto a trabajar en torneos de golf ni en nada relacionado con la imagen porque sufre complejos.[30]

En el turno de contrainterrogatorio, la representación legal del apelado confrontó a la señora Ríos Vélez con el informe del Cuerpo

---

[27] TPO págs. 49 línea 19; 50 líneas 1-3, 16-21; 51 líneas 1-7; 52 líneas 18-22; 53.
[28] TPO pág. 55.
[29] TPO págs. 57 líneas 1-11; 58 líneas 1-19.
[30] TPO págs. 59-63; 66 líneas 19-22; 67-69; 70 líneas 1-2; 85 líneas 11-18; 86 líneas 1-13; 96 líneas 8-16.

de Emergencias Médicas, el cual fue estipulado por los litigantes. En éste, surge que la "paciente estuvo cargando una bandeja de agua caliente cuando súbitamente el viento se la echó en los muslos". La misma información se desprende de la nota de progreso de la CFSE. No obstante, la apelante negó haberlo dicho, y rechazó haber tenido algún contacto con la bandeja.[31] Luego del testimonio de la apelante, CC1 solicitó la desestimación de la reclamación al amparo de la Regla 39.2 (c) de las de Procedimiento Civil. El TPI se reservó el fallo.[32]

### Aníbal González Franco

El testigo es gerente general de CC1. Para el 29 de junio de 2017 fungía como director comercial.[33] Teniendo en cuenta que la actividad de Río Mar se bifurcó en dos fases, una exterior y una interior, el señor González Franco declaró que estuvo en Río Mar el día del incidente,[34] pero no visitó la carpa de los productos de Kikuet.[35] Sin embargo, reconoció que durante el evento de golf se promocionaron productos de Kikuet a los participantes.[36] Indicó también que, en la convención dentro del hotel, Kikuet promocionó sus productos, a través de un *display*, un *booth* y un carretón en el patio. El testigo coordinó, además, para que la empresa tuviera un mostrador para servir comida.[37]

Con relación a la participación de CC1 en la convención de Econo, el señor González Franco declaró:

P. Okey. ¿Qué interés tiene CCI Companies con la realización de torneos de golf en las convenciones?

R. Es parte de la relación comercial con, en este caso era, me parece que Econo, que es cliente, entonces

---

[31] Apéndice, págs. 98 y 261. TPO págs. 110-112; 113 líneas 1-10; 119 líneas 10-14.
[32] 32 LPRA Ap. V, R. 39.2 (c). Véase, TPO págs. 121-124.
[33] TPO págs. 126 líneas 1-10; 127 líneas 2-5.
[34] TPO págs. 134 líneas 3-6; 137 líneas 15-19.
[35] TPO pág. 155 líneas 7-15.
[36] TPO pág. 139 líneas 12-22.
[37] TPO págs. 139 líneas 1-2; 140 líneas 10-12; 142 líneas 13-21. Apéndice, pág. 55.

también se hace una contribución económica y ellos recaudan fondos...

P. Okey. (Ininteligible), **¿en qué forma y manera CC1 participa** en dichas activa, actividades en torneos de golf específicamente?

R. **Se hace donación de productos**, en, aportación económica degustaciones, pero prácticamente...

.　　.　　.　　.　　.　　.　　.

P. Para llevar a cabo la promoción de sus productos, **¿qué participación tiene CC1 durante el transcurso del torneo?**

R. **Se provee productos antes del torneo y se le entrega a una agencia de promociones. En este caso se utilizaba Stylus** en ese momento, y...

P. Pues, dígale al tribunal **quién es Stylus**, Stylus Promo Group.

R. **Stylus es una empresa** pro.... honestamente no sé si sigue todavía, pero en ese momento **se utilizaba para todas las promociones de CC1**.

P. Okey. Para junio 29 del 2017, **¿habían** [*sic*] **ustedes utilizado previamente los servicios de Stylus?**

R. **Sí**.

.　　.　　.　　.　　.　　.　　.　　.

P. **¿Cuáles son los responsabilidades y obligaciones de Stylus cuando ustedes lo contratan?**

R. **Ellos seleccionan el personal, uniforme, montan el *display* o todo lo que vayan a hacer dependiendo del evento, recogían el producto en la fábrica o almacén...**

.　　.　　.　　.　　.　　.　　.

**...** y bueno **se encargan de todo el evento**.

.　　.　　.　　.　　.　　.　　.

P. **¿Qué injerencia, si alguna, tiene CC1 con la designación del personal o de escoger los equipos?**

R. **Ninguna**.[38] (Énfasis nuestro).

La contratación de Stylus se hacía por correo electrónico o teléfono. Stylus enviaba una cotización de los servicios prestados en un evento y luego cobraban el importe. Esa forma de contratación entre CC1 y Stylus era la usual y normal. Por igual, el señor González Franco asintió a la pregunta de que no había un contrato que detallara las responsabilidades de Stylus para los eventos de 29 de junio de 2017. Indicó que la experiencia de promoción con Stylus

---

[38] TPO págs. 127 líneas 11-20; 128; 130 líneas 1-10, 18-22.

durante el año y medio previo había sido positiva. Enfatizó que el equipo y personal lo escogía Stylus.[39] Es decir, CC1 no interfirió en la designación del personal ni el equipo a ser utilizado ni en la forma y manera en que Stylus ejecutaría la encomienda de promocionar los productos donados por Kikuet.

CC1 sí se involucró en la selección y cantidad de productos Kikuet que se iban a promocionar, pero delegó en Stylus el trabajo de promoción y no intervino en la forma y manera de llevarlo a cabo.

> P. El 29 de junio estaba dándose el, se llevó a cabo el torneo de golf. El 29 de junio es el día del accidente de la señorita Stephanie Ríos. [...]
>
> .  .  .  .  .  .  .  .
>
> R. Sí, sabíamos que teníamos un espacio.
>
> P. **Y los productos a ser promocionados eran de Kikuet, ¿correcto?**
>
> R. **Correcto**.
>
> P. No de Stylus, ¿correcto?
>
> R. Correcto.
>
> P. CC1 o Kikuet era quien decidía **qué productos** se iban a promocionar en el evento, ¿correcto?
>
> R. Correcto.
>
> P. CC1 decidía las **cantidades de los productos** a ser ofrecidos, *serving size*, ese tipo de cosa, ¿correcto?
>
> R. Correcto.
>
> P. Decidía **qué se iba a cocinar** en, ese día, ¿correcto?
>
> R. Correcto.
>
> .  .  .  .  .  .  .  .
>
> P. **CC1 sabía que iba a haber comida caliente en ¿correcto?**
>
> R. Correcto.
>
> .  .  .  .  .  .  .  .
>
> P. **Usted no corroboró ni preguntó qué medidas de seguridad iba a implementar Styli's (*sic*) en el evento**.
>
> R. **No**.
>
> P. En el torneo de golf, aun sabiendo que los productos que se iban a ofrecer eran de Kikuet y que el nombre que iba a aparecer en la carpa era el de Kikuet, usted

---

[39] TPO págs. 133; 153 líneas 7-21; 156 líneas 7-20; 157 líneas 6-12.

**no preguntó sobre las medidas de seguridad a ser tomadas para el día del torneo de golf, ¿correcto?**

R. **No**.

. . . . . . . .

P. **No verificó que se estuviesen tomando medidas de seguridad en la carpa, ¿correcto?**

R. **Correcto**.[40] (Énfasis nuestro).

En este caso, de conformidad con los hechos probados, CC1 era el dueño de los productos donados a la convención de su cliente Econo; y contrató a Stylus para que se encargara de realizar las actividades de promoción en el interior y exterior del hotel. En ambos espacios se confeccionaron alimentos de la marca Kikuet. En el caso de la carpa de promoción sita en el campo de golf, si bien CC1 seleccionó el tipo y cantidad de productos y solicitó a Stylus que llevara el equipo para freír,[41] tanto la selección de empleados como el equipo utilizado en el evento y la manera de ejecución de la obra fueron prerrogativas del contratista. Según surge de la prueba, previo a la fecha del incidente que nos ocupa, CC1 ya había utilizado los servicios de Stylus con resultados positivos. Como declaró el señor González Franco, usualmente, el contratista cotizaba los trabajos solicitados para los eventos y luego cobraba la prestación de servicios. Por ende, la relación contractual verbal entre CC1 y Stylus era una de principal y contratista independiente.

Así lo consignó probado el TPI al establecer que CC1 solamente proveyó los alimentos a promocionarse, ya que **el resto de la logística de la promoción era determinado por Stylus**. Apuntó en la *Sentencia*: "El Sr. Aníbal González de Kikuet dio su opinión sobre unos detalles de la actividad interior, m[a]s **la organización y logística de la actividad bajo la carpa en el**

---

[40] TPO págs. 146 líneas 16-19; 147; 148 línea 1; 149 líneas 2-6; 152 líneas 17-21; 153 líneas 1-6; 156 líneas 1-4.
[41] Apéndice, pág. 55.

**exterior se le delegó completamente a Stylus Promo Group, [Inc.] como de costumbre en este tipo de promociones**".[42]

El 29 de junio de 2017, en horas de la tarde, el clima se deterioró. Cuando la apelante se dirigió a la carpa a cargo de Stylus con el propósito de consumir alimentos, una ráfaga de viento muy fuerte causó que varios artículos se elevaran. Entre éstos, se levantó una bandeja de aluminio desechable con un poco de arroz, la cual estaba, a su vez, colocada sobre otra bandeja de agua caliente sobre un *sterno*. El contenido de la bandeja cayó sobre los muslos y las ingles de la señora Ríos Vélez y le causó quemaduras de primer y segundo grado.

Como se sabe, en armonía con nuestro ordenamiento probatorio, corresponde a la parte demandante la carga de probar la negligencia del demandado y no basta con alegarla. Regla 110 (A)-(B) de las Reglas de Evidencia, 32 LPRA Ap. VI. Es decir, en un caso de daños y perjuicios, en el que se alegue haber sufrido daños como consecuencia de la negligencia por omisión, el peso de la prueba respecto a la existencia de un deber jurídico de actuar le corresponde a la parte actora. Ello así, porque "[e]n materia de responsabilidad civil extracontractual, el hecho productor del daño nunca se presume". *Colón y otros v. K-mart y otros*, 154 DPR 510, 521 (2001) y los casos allí citados.

De los hechos resumidos, debemos colegir que, a la luz de la normativa jurídica esbozada, en el caso de autos, CC1 está eximido de responder por los daños probados y el TPI no erró al desestimar la reclamación de la apelante. La señora Ríos Vélez no demostró por preponderancia de la prueba que CC1, como empleador o principal, incumplió con un deber jurídico de actuar y cuya omisión fue la causa adecuada del daño. Veamos.

---

[42] Apéndice, pág. 82.

Conforme con el ordenamiento jurídico, **el empleador del contratista no responde** por la negligencia corriente de éste, al **no observar precauciones rutinarias**, que un contratista prudente y razonable tomaría; a menos que existan riesgos peculiares a la obra o servicio a realizar, que conlleven la adopción de precauciones especiales. De otro lado, **se exime de responsabilidad al empleador o principal** por la negligencia del contratista independiente **cuando se asegura que el contratista cuenta con la experiencia suficiente para llevar a cabo el trabajo o prestar el servicio**. Ello así, porque se espera que el contratista cuente con el conocimiento y pericia para tomar las medidas de precaución necesarias con el fin de evitar los riesgos inherentes a la obra o servicio. Reiteramos las diáfanas expresiones del Tribunal Supremo de que "**se entenderá que el empleador ha actuado como un hombre prudente y razonable al delegar las labores en una persona capacitada para llevar a cabo el trabajo**". (Énfasis nuestro). *Pons v. Engebretson, supra,* págs. 358-359.

En este caso, opinamos que CC1 actuó como una persona prudente y razonable al delegar a Stylus la ejecución de la obra pactada. CC1 no intervino ni tenía que intervenir, ya que Stylus contaba con la pericia para realizar las actividades de promoción en la convención de Econo. Es decir, el apelado procuró establecer relaciones comerciales con una empresa con experiencia, la cual, además, estaba debidamente asegurada con MAPFRE. CC1 no tenía el deber jurídico de indagar ni solicitar expresamente a Stylus la adopción de precauciones peculiares al contratarlo para que se hiciera cargo de los eventos de la convención. Al delegar los servicios solicitados a una persona jurídica capacitada para llevar a cabo el trabajo, entonces, era a Stylus de quien se esperaba que tomaría las medidas de precaución necesarias para prevenir los riesgos rutinarios e inherentes a la obra pactada. Al fin y al cabo, fue Stylus

quien, en todo momento, tuvo a su cargo la administración, la operación, el control y el uso de la carpa. CC1 se limitó a especificar el tipo de productos y sus respectivas cantidades, ya que recayó en el contratista la selección de los empleados idóneos, el equipo adecuado, así como la forma y manera de ejecutar los servicios contratados.

En fin, no albergamos duda de que la apelante sufrió daños provocados por el incidente desgraciado. Sin embargo, con respecto al apelado, somos del criterio que no existe nexo causal entre el daño aducido y la negligencia por omisión imputada a CC1, toda vez que el apelado no tenía un deber jurídico de actuar con relación a la contratación de empleados ni al uso de equipos ni a la toma de precauciones peculiares por parte de Stylus. Como se sabe, los elementos de la acción de responsabilidad civil extracontractual deben concurrir para poder prevalecer en un pleito de daños y perjuicios. Opinamos que, en este caso, no existe evidencia para demostrar, por preponderancia de la prueba, la alegada negligencia por omisión de CC1. La decisión del TPI es cónsona con el Derecho vigente que exime a CC1, como empleador y principal, de responder por los daños aducidos. Ciertamente, la causa adecuada de los daños sufridos por la señora Ríos Vélez no está vinculada a omisión alguna de CC1 ni a un deber de éste, en cuanto a la reconocida negligencia de Stylus al no asegurar adecuadamente las bandejas para que resistiera "una intensa ráfaga de viento". Precisamente, éste es el tipo de negligencia por la cual no responde el empleador o principal del contratista independiente. Tal como se infiere razonablemente de las determinaciones del TPI, si bien el viento era un hecho previsible, lo cierto es que CC1 fue diligente al contratar a una compañía experimentada para efectuar la labor del evento. Por lo tanto, no era previsible para CC1 que Stylus incurriría en la inobservancia de adoptar las precauciones rutinarias: causa

adecuada de los daños indudablemente sufridos por la señora Ríos Vélez. Tampoco CC1, ni como empleador o principal, estaba compelido a verificar los atributos de los empleados ni el equipo utilizados por el contratista. En suma, no existe una fuente legal que obligue a CC1 a responder. En consecuencia, no concurre el elemento de nexo causal entre daño y la acción u omisión del demandado que exige la acción por responsabilidad civil extracontractual. Al tenor, concluimos que, según lo resuelto en *Pons v. Engebretson, supra*, en ausencia de responsabilidad del empleador o principal por los daños causados por su contratista, apreciamos que el TPI no cometió los errores imputados, al declarar no ha lugar la *Demanda Enmendada* presentada por la apelante.

## IV.

Por lo fundamentos expresados, confirmamos la *Sentencia* apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones